23163

STATE of South Carolina, Respondent v. Larry Gene BELL, Appellant.

(393 S.E. (2d) 364)

Supreme Court

---

[1] This section was amended subsequent to O'Leary's plea by 198 No. 169, § 1, effective June 8, 1989. *See,* § 56-1-360 (Supp. 1989).

*Jack B. Swerling, S.C. Office of Appellate Defense, John H. Blume* and *David I. Bruck,* both of *Bruck & Blume,* Columbia, *for appellant.*

*Atty. Gen. T. Travis Medlock, Chief Deputy Atty. Gen. Donald J. Zelenka, Asst. Attys. Gen. Harold M. Coombs, Jr.* and *Norman Mark Rapoport,* Columbia, and *Sol. Donald V. Myers,* Lexington, *for respondent.*

Heard May 3, 1988.

Decided Feb. 26, 1990.

TOAL, Justice:

A jury convicted appellant, Larry Gene Bell, of the murder and kidnapping of Debra Mae Helmick. For these crimes, Bell was sentenced to death. We consolidate Bell's direct appeal with our mandatory review of his death sentence pursuant to S.C. Code Ann. § 16-3-25 (1985). We affirm his conviction and sentence.

The facts of the instant case must be considered together with the facts surrounding the abduction and murder of Shari Faye Smith (hereinafter Shari). On the afternoon of Friday, May 31, 1985, Bell abducted seventeen year old Shari from beside the mailbox in front of her home in Lexington County. On June 3, 1985, the Smith family began to receive a series of phone calls from Bell concerning Shari. After Bell related the precise whereabouts of Shari's body in one telephone call to the Smiths, he called again to describe how Shari died. Bell explained to Dawn Smith, Shari's sister, that he "took duct tape and wrapped it all the way around [Shari's] head." Bell also insisted that Dawn report the information concerning the duct tape and the suffocation to the coroner so he could accurately determine the cause of death.

Two weeks after Shari's abduction, at a time after Shari's body had been found but while Bell was still at large, Bell abducted and murdered another young girl. This victim was nine and a half year old Debra Mae Helmick. Debra Mae, her three year old brother, and her parents lived in a rented trailer in the Shiloh Trailer Park in Richland County. On June 14, 1985, at 4:00 p.m., Debra Mae and her brother were playing in the front yard beneath their trailer's front window. A

neighbor, looking out of the window of his trailer, observed what he described as a "silver" car drive rapidly into the trailer park, past the Helmick trailer and his trailer. The car turned around and stopped near the children. The neighbor saw a man he later identified as defendant Bell get out of the car with what appeared to be a white bag in his hand. Bell walked toward the children, grabbed Debra Mae around her waist and ran back to his car. Debra Mae was screaming and kicking. Bell threw her into his car. She continued to struggle and scream, kicking the inside roof of the car. The neighbor ran out of his trailer and attempted to stop the car. Bell accelerated the car and exited the trailer park. The neighbor got within 40 feet of the Bell automobile. He observed that the license was a South Carolina tag, first letter "D." The neighbor then ran to the Helmick trailer to alert Mr. Helmick.

Eight days after the abduction of Debra, Bell again called the Smith family to give them precise directions to find Debra's body. Following the directions given by Bell, the police located Debra's severely decomposed body in Lexington County on June 22, 1985. Debra's body was clothed in a tank top, shorts, her cotton panties, and over her panties, a pair of silk adult bikini briefs. Adhesive material, not inconsistent with duct tape, was found in Debra's hair, suggesting that she, like Shari, had been suffocated. Bell was apprehended by the police on June 27, 1985, while driving a grayish 1978 Riviera. Although the car's affixed license plate read "OCH 241," a search of the car's trunk revealed the existence of a second license plate. This plate read "DCE 604." Also found in the trunk was the registration card for the car, which indicated that "DCE 604" was the Riviera's license plate number.

In June of 1986, Bell was tried for the murder and kidnapping of Shari Smith, found guilty of these crimes and sentenced to death.[1] In March of 1987, Bell was tried, convicted and sentenced to death for the murder and kidnapping of Debra Mae Helmick. Bell now appeals from the 1987 conviction and sentence.

## I. GUILT PHASE

[1]This conviction and sentence was affirmed in *State v. Bell*, 293 S.C. 391, 360 S.E. (2d) 706 (1987); *cert. denied* 484 U.S. 1020, 108 S.Ct. 734, 98 L. Ed. (2d) 682 (1988).

## A. JURY QUALIFICATION

Bell alleges that the judge erred in the jury qualification.[2] First, Bell maintains that the trial judge erred in qualifying nine jurors who knew the appellant had previously been sentenced to death for the murder and kidnapping of Shari Faye Smith. Such knowledge, Bell submits, rendered his conviction and sentence of death constitutionally unreliable. Second, Bell contends that the judge abused his discretion in not striking three jurors who purportedly equivocated concerning their views on the death penalty.

The determination of whether a juror is qualified to serve on a death penalty case is within the sound discretion of the trial judge, and is not reviewable on appeal unless wholly unsupported by the evidence. *State v. Spann*, 279 S.C. 399, 308 S.E. (2d) 518 (1983), *appeal dismissed, cert. denied*, 466 U.S. 947, 104 S. Ct. 2146, 80 L. Ed. (2d) 533 (1984). A *voir dire* examination must be reviewed in its entirety to determine whether the trial judge erred in his qualification or disqualification of prospective jurors. *State v. Drayton*, 293 S.C. 417, 361 S.E. (2d) 329 (1987), *cert. denied*, 484 U.S. 1079, 108 S.Ct. 1060, 98 L. Ed. (2d) 1021 (1988).

The constitutional standard of fairness requires that a defendant have a panel of impartial, indifferent jurors. *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. (2d) 751 (1961). In *Irvin*, the United States Supreme Court addressed the issue of pretrial knowledge of facts by jurors where the appellant had been sentenced to death. The Court found that it was not required that jurors be totally ignorant of the facts and issues involved in a case. The Court opined that "it [was] sufficient if the juror [could] lay aside his impression or opinion and render a verdict based on the evidence presented in Court." *Irvin*, 366 U.S. at 723, 81 S. Ct. at 1643. Here, each of the jurors at issue stated that they could set aside any opinions garnered from their prior knowledge of the appellant's conviction and/or sentence of death for the murder of Shari Smith and would be able to give the appellant a fair and impartial trial.

In *Murphy v. Florida*, 421 U.S. 794, 95 S. Ct. 2031, 44

---

[2] We note that venue in this case, which originally lay in Lexington County, was changed to the upstate county of Pickens.

L. Ed. (2d) 589 (1975), the defendant, "Murph the Surf," notorious for his involvement in the 1964 theft of the Star of India sapphire, claimed that the jurors were biased because they knew about his previous convictions. The Court held that juror exposure to information about a defendant's prior convictions or to news accounts of the crime with which he is charged does not alone presumptively deprive the defendant of due process. The Court declined to find that the setting of the trial was inherently prejudicial, and declined to find prejudice in the jury selection process. *Murphy*, 421 U.S. at 803, 95 S. Ct. at 2038.

Our Court considered whether the trial court erred in not excusing four jurors who had heard of the case and some of its details in *DeLee v. Knight*, 266 S.C. 103, 112, 221 S.E. (2d) 844, 847 (1975) *cert. denied*, 426 U.S. 939, 96 S. Ct. 2658, 49 L. Ed. (2d) 392 (1976). Even though the jurors had some knowledge of the case, we found that each juror had not formed a conclusive opinion as to the guilt or innocence of the accused, and could render a just verdict based solely on the evidence presented at trial.

Consistent with the holdings in *DeLee* and *Murphy*, we conclude here that each juror who had knowledge of Bell's prior conviction and death sentence stated that he could set aside his impression or opinion and render a verdict based on evidence presented in the courtroom. In response to the questions by the attorneys and the Court, each juror expressed his belief that he could set aside any prejudice, passion or bias that he/she might harbor. Hence, we hold that the judge did not abuse his discretion in qualifying the challenged jurors.

In so holding, we also reject Bell's argument that the jurors' knowledge of the previous death sentence diminished their sense of responsibility in deciding what sentence to impose. Bell relies, by analogy, on the United States Supreme Court's decision in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. (2d) 231 (1985). In *Caldwell*, the prosecutor urged the jury not to view itself as the final determiners of whether the petitioner would die, since a death sentence would be reviewed for correctness by the Mississippi Supreme Court. The Court concluded that this invitation to rely on the Mississippi Court's review would generate a bias toward returning a death sentence. *Caldwell*, 472 U.S. at 333,

105 S. Ct. at 2642.

We find that the reasoning of *Caldwell* does not control the case at bar. The jurors have disavowed themselves prior to their qualification of any bias or prejudice against the appellant, specifically with respect to his previous sentence of death.

Likewise, we find that the judge did not abuse his discretion in qualifying three jurors because of their views concerning the death penalty. In *Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. (2d) 841 (1985), the United States Supreme Court held that if a venireman's views regarding capital punishment would prevent or substantially impair the performance of his duties as a juror, then he should be excluded for cause. *Wainwright*, 469 U.S. at 420, 105 S. Ct. at 850.

The decision as to whether a venireman's views would substantially impair the performance of his duties as a juror rests with the sound discretion of the judge, and no reversal shall occur unless the record establishes an abuse of discretion. *DeLee v. Knight*, 266 S.C. at 112, 221 S.E. (2d) at 847. Here, all three jurors indicated that they would be able to give a sentence of life or death depending on the facts and circumstances. Reviewing the entire *voir dire* of the first juror challenged, we conclude that the judge properly found that the juror would consider the case on its merits. The other two jurors initially misunderstood the bifurcation of the trial, but later, after clarification, responded that they could impose either the death penalty or a life sentence. The trial judge, therefore, did not abuse his discretion in qualifying the challenged jurors.

### B. ADMISSIBILITY OF EVIDENCE

Bell contends that the trial court abused its discretion in admitting evidence of other crimes and bad acts. Specifically, Bell submits that the trial court erred in two ways: first, by admitting several recordings of telephone calls made by Bell to Shari Smith's mother and sister, and second, by admitting a bag containing women's underwear.

We will first consider whether the judge erred in admitting the redacted tapes of the telephone conversations between Bell and the Smith family. As previously discussed, two

weeks before the kidnapping of Debra Mae Helmick in Richland County, teenager Shari Smith was kidnapped from Lexington County and murdered. Bell was convicted and sentenced to death for this murder. *State v. Bell*, 293 S.C. 391, 360 S.E. (2d) 706 (1987).

During the time Shari was missing, members of the Smith family received a series of phone calls from Bell. All of the telephone conversations, except one, were recorded by the police. The trial judge, over objection, decided to admit certain portions of the tapes, excising portions he believed to be prejudicial.

The judge admitted portions of five conversations between Bell and the Smiths. In the first tape, Bell disclosed the time and manner of the abduction, and said that Shari had "the fear of God in her." In the second tape, admitted in its entirety, Bell gave the following directions which led police to Shari's body:

> Listen carefully. Take Highway 378 West to Traffic Circle. Take Prosperity Exit, go one and a half miles, turn right at sign, Moose Lodge Number 103, go one quarter mile, turn left at white framed building, go to backyard, six feet beyond we're waiting. God chose us.

In the third tape, Bell described Shari's death to her sister, Dawn Smith:

> THE CALLER: Okay. And I did make love to her and we had oral sex for uh—three different times and uh—she died—can you handle this now?
> D. SMITH: Yes.
> THE CALLER: Okay. I tied her up to the bed post and uh—with electric cord and uh—she didn't struggle, cry or anything. She let me voluntarily, from her chin to her head—oh, yeah, and be sure to tell—okay, I'll go ahead and tell you. And I took duct tape and wrapped it all the way around her head and suffocated her and tell the coroner or get the information out how she died. . . .

In the fourth tape, Bell reiterated that Shari died by suffocation with duct tape. In the fifth tape, Bell, in his final call to the Smith's residence, directed the Smiths and the police to

Debra's body. The directions were as follows:

> Listen carefully. Go One North—well, One West, turn left at Peach Festival Road or Bill's Grill, go three and a half miles through Gilbert, turn right, last dirt road before come to stop sign at Two Notch Road. Go through chain and no trespassing sign. Go 50 yards and to the left, go 10 yards. Debra Mae is waiting. God forgive us all.

Bell objects to the admission of the evidence of other crimes as found on the redacted tapes.

In order for this Court to reverse a case based on erroneous admission or exclusion of evidence, error and prejudice must be shown. *State v. McElveen,* 280 S.C. 325, 313 S.E. (2d) 298 (1984).

In *State v. Lyle,* 125 S.C. 406, 118 S.E. 803 (1923), we articulated the exceptions to the general rule that evidence of other crimes is not admissible to prove the crime charged. Our Court found that evidence of other crimes was competent to prove the specific crime charged when it tends to establish the following: (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; and (5) the identity of the person charged with the commission of the crime on trial. *Lyle,* 125 S.C. at 416, 118 S.E. at 807. The evidence must be logically relevant to the particular purpose or purposes for which it is sought to be introduced. *Id.* Additionally, the other acts evidence must also be established by clear and convincing evidence. *Id.*[3]

Bell requests that this Court limit the *Lyle* rule by finding that other acts evidence is admissible only if necessary. Relying mainly on *State v. Johnson,* 293 S.C. 321, 360 S.E. (2d) 317 (1987), Bell argues that the trial judge erred in admitting the other acts evidence because it was not needed. Bell notes that the State had the testimony of an eyewitness who identified Bell as the abductor as well as other evidence linking him to the crime. In *Johnson,* we stated that "evidence of other crimes is never admissible un-

---

[3] Proof of an actual conviction, of course, is one way in which a proponent of the evidence can establish bad acts and satisfy the "clear and convincing" standard. *State v. Drew,* 281 S.C. 440, 316 S.E. (2d) 367 (1984).

less necessary to establish a material fact or element of the crime charged." 293 S.C. at 324, 360 S.E. (2d) at 319. Consistent with our rulings since *Lyle*, we define "necessary" as synonymous with "relevant." Thus, evidence of other crimes is never admissible unless relevant to establish a material fact or element of the crime charged. The evidence contained on the tapes was relevant here. It connected Bell to the commission of the murder of Debra by demonstrating the similarities between the Helmick and Smith murders. It was also relevant because the Smith and Helmick murders were so intertwined.

The State, however, must also show that the evidence sought to be introduced fits into one of the *Lyle* exceptions. The evidence of the details of the kidnapping and murder of Shari Smith, we conclude, was properly admitted as evidence of a larger plan or scheme of which the crime on trial was a part. In *State v. Anderson*, 253 S.C. 168, 169 S.E. (2d) 706, *cert. denied*, 396 U.S. 948, 90 S. Ct. 386, 24 L. Ed. (2d) 253 (1969), we espoused the following test for the admissibility of evidence to show a common plan or scheme:

> The question is whether the particular item of evidence tends to show the existence, the nature or the content of the plan. Much of the showing is evidence of the conduct of the defendant, and the specific question becomes whether the particular conduct circumstantially tends to prove the design or plan.

*Anderson*, 253 S.C. at 181-82, 169 S.E. (2d) at 712. *See also, State v. Woomer*, 276 S.C. 258, 277 S.E. (2d) 696 (1981) (Evidence of other killings committed prior to the crime on trial was admissible to show the existence and commission of a preconceived plan which tended strongly to implicate the defendant as a participant).

In the present case, the tape recorded conversations concerning Shari Smith's murder and kidnapping show the existence and the nature of Bell's plan. The State demonstrated that Bell devised a plan to kidnap and murder young, blonde girls and then utilize the Smith family as a platform to disclose the crimes. Bell's plan surrounding the murders of Shari and Debra implicated him as the murderer. The murders of Shari and Debra were joined together through Bell's own ac-

tions. The plan and commonality of the two crimes, such that the first crime tends to prove the second crime, is disclosed throughout the tapes.

In the first tape, the link between the two crimes can be seen: both blonde girls were kidnapped in broad daylight in late afternoon, on a Friday, from in front of their respective homes. Moreover, in the second tape, the precise directions given by Bell to Shari Smith's body are echoed in the directions he gave to lead the police to Debra Helmick's body. Bell commenced both calls with the phrase "listen carefully." He ends the directions by referring to God. He also ominously stated in both tapes that Shari and Debra are waiting. In the third tape, Bell recounted how Shari Smith died. He told Dawn Smith that Shari died by suffocation. The manner of Shari Smith's death—suffocation by duct tape—was consistent with the way Debra died. A SLED analyst testified that residue found in Debra's hair was consistent with the type of adhesive found on duct tape. Thus, it could be concluded that Debra suffered death in a manner identical to that of Shari.

Similarly, the sexual activity with Shari disclosed by Bell was also probative of a common scheme because Debra was found with a pair of silk underwear pulled over her cotton underwear, inferentially connoting sexual activity. The circumstances surrounding the murder of Shari Smith were so blended with the murder of Debra that the proof of Shari's murder established the material fact that Bell murdered and kidnapped Debra. Furthermore, the proof of the common scheme—the kidnapping, murder and contact with the Smith family—strongly implicated Bell as the person who committed the crimes. By his own actions, Bell linked the two crimes together, and consequently, the evidence on the tapes was probative of his conduct.

The conversations between the Smith family and Bell were also admissible to show Bell's motive and state of mind when he kidnapped and murdered Debra. Evidence of prior acts which demonstrates motive is admissible. *See State v. Grainger*, 275 S.C. 417, 272 S.E. (2d) 175 (1980) (Evidence that defendant was a drug dealer was admissible to establish motive for flight which resulted in the death of a

police officer).

Bell recounted to Dawn Smith his sexual experiences with Shari during one of the telephone conversations. The trial judge properly admitted the conversation because it demonstrated a possible sexual motive for the kidnapping of Debra. As discussed earlier, Debra's body was discovered with an extra pair of adult female silk bikini underwear on top of her cotton children's underwear. Although Debra's body was too decomposed to ascertain whether sexual intercourse or the like had occurred, the existence of the adult underwear on the child was evidence that Bell was impelled to kidnap her for bizarre sexual reasons. Evidence of Bell's sexual motivations was properly considered by the jury.

Although we find that the evidence is admissible under two of the *Lyle* exceptions, we must also determine whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. If the prejudicial effect outweighs its probative value, such evidence should be excluded. Whether prejudicial error has been committed must be determined on the basis of the record in its entirety and the result will generally turn on the facts of each case. *U.S. v. Johnson*, 610 F. (2d) 194 (4th Cir. 1979), *cert. denied* 446 U.S. 911, 100 S. Ct. 1840, 64 L. Ed. (2d) 264 (1980).

We reversed the appellant's conviction in *State v. Johnson*, 293 S.C. 321, 360 S.E. (2d) 317 (1987) because the admission of prior acts evidence was prejudicial. The case at bar, however, is unlike *Johnson*. Here, the redacted telephone conversations between Bell and the Smith family were highly probative of the State's contention that Bell also kidnapped and murdered Debra. In *Johnson*, most of the other crime evidence had little probative value, and instead served merely to "prejudice the jury by focusing its attention on appellant's propensity to commit criminal acts." *Johnson*, 293 S.C. at 326, 360 S.E. (2d) at 320. Therefore, we hold that because of the highly probative nature of the tapes here, their prejudicial impact did not outweigh their probative value.

Bell also contends that the judge abused his discretion in admitting into evidence a bag of women's underwear seized by investigators from Bell's bedroom. The women's silk bikini underwear were similar to the extra pair of adult underwear found on Debra's body. Since the police seized the bag of underwear from Bell's bedroom, and because the seized underwear were similar to the kind the victim was wearing, the panties were admissible since they tended to make Bell's guilt more probable. *State v. Schmidt*, 288 S.C. 301, 342 S.E. (2d) 401 (1986) (Evidence is relevant if it tends to establish or to make more or less probable some matter at issue upon which it directly or indirectly bears). We therefore hold that the admission of the bag of women's underwear was proper.

## C. STATUTORY WAITING PERIOD

Bell further contends that he was prejudiced when he was required to exercise his right to the statutory waiting period between the guilt phase and the sentencing phase of his bifurcated trial in the presence of the jury. The judge, after inquiring whether the appellant desired to exercise his right to the statutory waiting period, explained to the jury that there existed a "statutorily provided for"[4] waiting period of twenty-four hours before the sentencing phase could commence. Since the verdict was rendered on a Friday, the judge informed the jury that the trial would not commence again until Monday. The jury was sequestered through the weekend.

Bell asserts that the judge's actions prejudiced him because the jury was told that it would have to be sequestered for an additional two days solely due to his decision to rely on his statutory right. Since the judge explained that the trial would be lengthy during the *voir dire*, we believe all the jurors understood the projected length of the proceedings. Moreover, the judge clearly articulated that the right to a twenty-four hour waiting period was statutorily mandated, and the defendant's right. We hold, therefore, that the trial judge did not err in asking Bell whether he desired to exercise his statutory waiting period in the presence of the jury.

---

[4] S.C. Code Ann. § 16-3-20(C).

## II. SENTENCING PHASE ·

### A. TESTIMONY OF ASSISTANT SOLICITOR

In the penalty phase, the State presented testimony ██ from a former Assistant Solicitor who represented the State in a guilty plea proceeding involving Bell. Bell pled guilty to assault and battery of a high and aggravated nature in 1976. The Solicitor testified that Bell attempted to abduct a young woman at gunpoint in 1975. The victim of the crime did not testify concerning the assault.

Although Bell agrees that the information concerning the details of prior offenses could be introduced during the penalty phase, *see State v. Plath*, 281 S.C. 1, 313 S.E. (2d) 619 (1984), he maintains that such evidence in the form of the Solicitor's testimony was inadmissible hearsay. We need not address this issue, since Bell was clearly not harmed by the admission of this evidence.

Bell cannot show prejudice because he also presented numerous witnesses in mitigation who testified generally about his propensity to assault women, and specifically about the assault the Solicitor recounted. Indeed, we perceive Bell's trial strategy as one which sought to draw the jury's attention to his bizarre sexually deviant behavior in order to support his contention in mitigation that he was mentally ill. Having failed to show prejudice, Bell cannot complain about the Solicitor's testimony. *Cf. State v. Blackburn*, 271 S.C. 324, 247 S.E. (2d) 334 (1978) (it is a settled rule that the admission of improper evidence is harmless where it is merely cumulative to other evidence).

### B. SOLICITOR'S CLOSING ARGUMENT

Bell asserts that the Solicitor's closing argument in the sentencing phase contained three areas of prejudicial comment. First, Bell contends that the Solicitor and Assistant Solicitor injected their opinions as to the appropriateness of the death penalty into their arguments. Second, Bell maintains that the Solicitor implied that the imposition of anything less than a death sentence would indicate the jurors' weaknesses. Third, Bell asserts that the Solicitor made improper references to the victim.

A trial judge is vested with broad discretion in dealing with the range of propriety of closing argument, and ordinarily his rulings on such matters will not be disturbed. *State v. Patrick*, 289 S.C. 301, 345 S.E. (2d) 481 (1986). The Court must review the argument in the context of the entire record. *State v. Linder*, 276 S.C. 304, 278 S.E. (2d) 335 (1981). The appellant has the burden of showing that any alleged error in argument deprived him of a fair trial. *Id.* The Solicitor's argument, however, must be carefully tailored so as not to appeal to the personal bias of a juror, and may not be calculated to arouse the juror's passion or prejudice. *Id.*

Bell complains that the Solicitors injected their personal opinions into their summations. As an example, one Solicitor stated during his closing argument that if "this [wasn't] a case in which a jury should impose the death penalty, if this [wasn't] the type of case in which the State should seek the death penalty and expect the death penalty, then there is none." The Solicitor also implored the jury "to do what's right." He stated that if "it was not right in this case, it was never right."

Bell relies on *State v. Woomer*, 277 S.C. 170, 284 S.E. (2d) 357 (1981) and *State v. Butler*, 277 S.C. 543, 290 S.E. (2d) 420 (1982) to support his proposition that the Solicitors injected their personal opinions into their closing arguments. In *Woomer*, we held that the Solicitor minimized the juror's responsibility for the appellant's fate by stressing that he had already made the same decision he was asking them to make. The Solicitor there commented as follows:

> You know, the initial burden in this case is not on you all. It was on me. I am the only person in the world that can decide whether a person is going to be tried for his life or not. I mean I did the same thing you all did. I had to make up my mind in regards to this and under the law, if there is any question about it, you ask the judge, I have to make the first decision as to whether or not a person is going to be tried for the electric chair.

277 S.C. at 175, 284 S.E. (2d) at 359. Because the Solicitor injected his personal opinion into the jury's deliberation, we reversed the defendant's sentence.

In Butler, we held that:

> When a solicitor's personal opinion [was] explicitly injected into the jury's determinations as though it were in itself evidence justifying the sentence of death, the resulting death sentence may not be free from the influence of any arbitrary factor as required by S.C. Code Ann. § 16-3-25(c)(1) and the Eighth Amendment to the Constitution.

277 S.C. at 546, 290 S.E. (2d) at 421.

We find that the Solicitor's comments in *Woomer* and *Butler* are easily distinguishable from the instant case. Here, the Solicitor did not inject his personal opinion concerning the death penalty into the proceedings. Nor did the Solicitor comment on his involvement in deciding whether or not to prosecute for the death penalty. The Solicitor's comments did not diminish the role of the jury to decide Bell's fate, thus, we hold that the argument was proper.

Similarly, Bell's reliance on *State v. Plath*, 277 S.C. 126, 284 S.E. (2d) 221 (1981) and *State v. Davis*, 239 S.C. 280, 122 S.E. (2d) 633 (1961) is misplaced. In *Plath*, the Solicitor stated in closing argument that he would never ask for the death penalty again if the jury did not return with a recommendation that the death penalty be imposed. In *Davis*, the same Solicitor commented that if the jury turned the defendant accused of rape loose, he would have to turn loose all others accused of rape.

The Solicitor's comments here are distinguishable from the erroneous ones in *Davis* and *Plath*. Here, the Solicitor did not challenge the jury by telling them what he would do if the jury failed to impose a death sentence. We conclude that the Solicitor's argument was proper.

Bell next maintains that the Solicitor improperly implied to the jury that their imposition of a life sentence would be a "cop out." We reject Bell's argument.

In *State v. Reed*, 293 S.C. 515, 362 S.E. (2d) 13 (1987), the Solicitor argued that any recommendation of less than death would be evidence the jurors lacked courage and had "copped out." The Solicitor also referred to those "bad life sentences" and attempted to pressure the jury into rejecting appellant's evidence in mitigation by referring to public opinion. We con-

cluded that the Solicitor's final argument was not carefully tailored to avoid appealing to the personal bias of a juror. We also found that the argument was calculated to arouse the jurors' passion or prejudice. *See also, State v. Cockerham,* 294 S.C. 380, 365 S.E. (2d) 22 (1988) (Solicitor commented that defendant depended on the jurors' "soft underbell[ies], lack of courage," and "lack of commitment" to not give him the death penalty).

The Solicitor here did not attack the courage or lack thereof of the jury to impose the death sentence in his closing argument. In *Cockerham* and *Reed,* the Solicitors launched personal attacks against the jury. The Solicitor did not bully the jury as the Solicitors did in *Reed* and *Cockerham.* The only similarity between *Reed, Cockerham* and the instant case is the use of the colloquialism, "cop-out." Reviewing the Solicitor's comments in the context of the entire record as we are required to do, *State v. Lindner,* 276 S.C. 304, 278 S.E. (2d) 335 (1981), we hold that the comments did not "so infect the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S. Ct. 1868, 1871, 40 L. Ed. (2d) 431, 437 (1974).

Bell also contends that the Solicitor's comments improperly referred to the victim. We disagree. The Solicitor, at the beginning of his summation, remarked that his voice would be the last one heard on behalf of the State and Debra Helmick. The Solicitor suggested to the jury that imposing a sentence less than the death penalty would be a "blight on the memory" of Debra Helmick. He also commented:

> I sat in my chair before you came out this morning and I tried to imagine what Debra Mae Helmick would look like sitting on that witness stand today. Well, we know she's not here and we know why she's not here.

In *State v. Middleton,* 295 S.C. 318, 323, 368 S.E. (2d) 457 459 (1988), *cert. denied* —U.S. —, 109 S. Ct. 189, 102 L. Ed. (2d) 158 (1988), this Court upheld the argument of the Solicitor wherein he stated: "To sentence [appellant] other than to death would be a mockery of the memory of Shirley Mae Mack." Hence, we have already addressed and disposed of such an argument in *Middleton.*

The appellant also argues that the Solicitor suggested he was appearing on behalf of Debra. In *State v. Bell*, 293 S.C. 391, 360 S.E. (2d) 706 (1987), *cert. denied* 484 U.S. 1020, 108 S. Ct. 734, 98 L. Ed. (2d) 682 (1988), we upheld a similar Solicitor's argument. We thus find no error in the Solicitor's comment that he was appearing on behalf of the State and Debra Mae Helmick.

In reviewing the Solicitor's comments in the context of the entire record, we find no errors in the Solicitor's closing arguments.

### C. JURY INSTRUCTIONS

Bell asserts that the trial court erred in instructing the jury during the penalty phase. First, Bell maintains that the penalty phase instructions improperly restricted the jury's ability to consider all mitigating evidence by suggesting that only statutory mitigating circumstances were relevant.

The trial judge charged the jury as follows:

> In arriving at your recommendation you may consider any mitigating circumstances otherwise authorized or allowed by law and you may consider certain so-called statutory aggravating and mitigating circumstances which are supported by the evidence.

After defining mitigating circumstances, the judge stated:

> As a matter of fact, you may recommend that the defendant receive a life sentence irrespective of whether you find the existence in the evidence of an alleged statutory mitigating circumstance or not. In fact, you may recommend a sentence of life imprisonment for any reason you can think of or for no reason at all.

> The issue presented is whether the trial judge properly presented nonstatutory mitigating circumstances to the jury. We have previously upheld the contested charge as sufficient to instruct a nonstatutory mitigating circumstance. *State v. Singleton*, 284 S.C. 388, 326 S.E. (2d) 153 (1985), *cert. denied*, 471 U.S. 1111, 105 S. Ct. 2346, 85 L. Ed. (2d) 863 (1985).

Bell's contention that *Hitchcock v. Dugger*, 481 U.S. 393, 107 S. Ct. 1821, 95 L. Ed. (2d) 347 (1987) supports his argu-

ment is without merit. In *Hitchcock*, the Supreme Court held that a sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence. Here, the trial court referred implicitly and explicitly to nonstatutory mitigating circumstances at least twice. The trial court instructed the jury that they could give a life sentence for any reason or for no reason at all. The trial court also stated that the jurors could consider any mitigating circumstances otherwise authorized or allowed by law. Thus, based on our prior case law and because *Hitchcock* does not control here, we hold that the Court properly charged the jury on mitigating circumstances.

Bell next asserts that the trial court erred by implying in his instruction that the jury could not consider "sympathy" arising from the case in mitigation.

The trial judge charged:

> In considering whether to recommend that the defendant be sentenced to death or to life imprisonment, I charge you that you are not to allow any passion, prejudice, or any other arbitrary factor to influence your judgment. As jurors, you must decide the issues involved in this proceeding without bias and without prejudice to any party. You cannot allow yourselves to be governed by sympathy, by prejudice, by passion, or by public opinion. Both the State and the defendant have the right to expect that each of you will carefully and impartially consider all the evidence in the case and you will follow the law as I have given it to you in determining your recommendation.

Bell contends that this instruction is erroneous in light of *California v. Brown*, 479 U.S. 538, 107 S. Ct. 837, 93 L. Ed. (2d) 934 (1987), and that it diverts the jury from its constitutional duty to consider mitigating factors in favor of the defendant. In *Brown*, the United States Supreme Court held that an instruction informing jurors that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" during the penalty phase did not violate the Eighth and Fourteenth Amendments of the United States Constitution.

The Court fashioned a two-pronged analysis to guide us in our review of Bell's contention. The initial focus is on the "specific language challenged." If the specific instruction fails constitutional muster, we are told next to "review the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *Brown*, 107 S. Ct. at 839. In *Brown*, the Court noted that it need not reach the second step of analysis, since "a reasonable juror would not interpret the challenged instruction in a manner that would render it unconstitutional." *Id.* at 839-40.

Bell argues that the instruction given in his trial constitutionally differs from the one approved in *Brown*.

He points out that the word "sympathy" is the first word in the string of nouns in the instant instruction, while it is third in the *Brown* instruction. He also notes that the word "mere" is missing from the instant instruction, unlike the instruction in Brown.

The *Brown* Court stated:

> We also think it highly unlikely that any reasonable juror would almost perversely single out the word "sympathy" from the other nouns which accompany it in the instruction: conjecture, passion, prejudice, public opinion, and public feeling. Reading the instruction as a whole, as we must, it is no more than a catalog of the kind of factors that could improperly influence a juror's decision to vote for or against the death penalty.

*Id.* at 840. This analysis applies with equal force to the instant instruction. We therefore reject Bell's argument that the exact position of the word "sympathy" in a string of nouns is of constitutional import.

This same excerpt from *Brown* disposes of Bell's complaint about the absence of the word "mere." As well-reasoned by the Court, the word "sympathy" is listed among other factors (prejudice, passion, *etc.)* which are clearly improper bases for a jury decision. Hence, as the Court stated, "a rational juror could hardly hear this instruction without concluding that it was meant to confine the jury's deliberations to considerations arising from the evidence presented, both aggravating and mitigating." *Id.*

Even if we assume *arguendo* that Bell overcomes the first step in the *Brown* analysis, he surely fails at step two. Reviewing the judge's instructions as a whole, Bell's jury was told that they could recommend a "sentence of life imprisonment for any reason you can think of or for no reason at all." (Tr. at 2145-46). They were also told that they were allowed to consider mitigating circumstances, both statutory ones and those "otherwise authorized or allowed by law." Further, the instant "sympathy" instruction about which Bell complains was given at the end of the penalty phase, after Bell had finished putting forth all of his evidence in mitigation. A reasonable juror would simply not isolate the word "sympathy," disregard all of Bell's evidence and all of the trial judge's previous instructions, and refuse to consider mitigating evidence. We therefore hold that Bell's complaints regarding the "sympathy" charge are without merit.

Lastly, Bell asserts that the trial judge erred in rejecting his attempt to waive any *ex post facto* objection to the application of the thirty year provision of the Omnibus Criminal Justice Improvement Acts of 1986. Additionally, Bell argues that the trial judge erred in failing to charge the jury that a person sentenced to life imprisonment for murder would not be eligible for parole until after service of twenty years. We rejected both these arguments in *State v. Matthews*, 296 S.C. 379, 373 S.E. (2d) 587 (1988), *cert. denied* — U.S. —, 109 S. Ct. 1559, 103 L. Ed. (2d) 861 (1989). We, therefore, hold that these arguments are without merit here.

## D. PROPORTIONALITY REVIEW

We have reviewed the entire record and conclude the death sentence was not the result of passion, prejudice or any other arbitrary factor, and the evidence supports the jury's finding of aggravating circumstances. S.C. Code Ann. § 16-3-25(C)(1)-(2). The death penalty is not excessive or disproportionate to the penalty imposed in similar cases. S.C. Code Ann. § 16-3-25(C)(3). *See, State v. Bell*, 293 S.C. 391, 360 S.E. (2d) 706 (1987), *cert. denied*, 484 U.S. 1020, 108 S. Ct. 734, 98 L. Ed. (2d) 682 (1988); *State v. Adams*, 279 S.C. 228, 306 S.E. (2d) 208 (1983) *cert. denied*, 464 U.S. 1023, 104 S. Ct. 558, 78 L. Ed. (2d) 730 (1983); *State v. Copeland*, 278 S.C. 572, 300 S.E. (2d)

63 (1982), *cert. denied* 460 U.S. 1103, 103 S. Ct. 1802, 76 L. Ed. (2d) 367 (1983).

We therefore affirm Bell's conviction and sentence.

Affirmed.

GREGORY, C.J., and HARWELL, CHANDLER and FINNEY, JJ., concur.