## 2508

The STATE, Respondent v. Larry Don NELSON, Appellant.

(471 S.E. (2d) 767)

Court of Appeals

*Jack Swerling*, Columbia, *for appellant.*

*Attorney General Charles Molony Condon, Chief Deputy Attorney General Donald J. Zelenka, Assistant Attorneys General Harold M. Coombs, Jr.,* and *William Edgar Salter, III*, Columbia; and *Solicitor Donald V. Myers*, Lexington, *for respondent.*

Heard Apr. 3, 1996.

Decided May 13, 1996; Reh. Den. June 21, 1996.

GOOLSBY, Judge:

Larry Don Nelson appeals his conviction on four counts of criminal sexual conduct with a minor in the first degree and four counts of lewd act on a minor. We affirm.

Beginning in 1991, Amber Hayes, the three-year-old victim, accompanied her father to visit his friend, James Nelson. Larry Don Nelson lived with his mother and his brother James. During these visits, Amber spent time alone with Larry. On June 8, 1992, Dr. Graham, Amber's pediatrician, examined her and, as a result, suspected sexual abuse. He referred Amber to Dr. Breeland, a codirector of a clinic for children suspected of having been physically or sexually abused. After examining Amber on June 10, 1992, Dr. Breeland concluded Amber had been sexually abused. As a result of these findings, Dr. Breeland contacted D.S.S. D.S.S. removed Amber from her home on June 11, 1992, and placed her in the care of her grandmother.

After receiving counseling from Beth Maris, a sexual trauma therapist, Amber was returned to her home on August 21, 1992. Eventually, Amber told Maris and her grandmother that Larry Nelson and James Nelson had abused her. Amber's mother then contacted D.S.S. James and Larry Nelson were subsequently arrested and charged with criminal sexual conduct with a minor.[1]

---

[1] James Nelson was eventually indicted for misprison of a felony based upon his actual involvement in the case.

At trial, the State introduced Amber's testimony through a video deposition. At the time of her deposition, Amber was five years old. Amber testified Larry Nelson sexually molested her on three separate occasions.

The State also offered testimony from Maris, a licensed independent clinical social worker and a certified sex therapist. Maris was qualified as an expert in the area of sexual therapy and the subsection of that area of sexual trauma and abuse of children. Maris testified she began seeing Amber around July 20, 1992. She interviewed Amber's family and concluded it was not an abusive family. As a result of her findings, Maris submitted a written report dated August 14, 1992, to D.S.S. recommending Amber be returned to her family. Maris testified she did not know the identity of the perpetrators at the time she submitted her report. After subsequent counseling, Amber identified her assailants to Maris, who in turn told Amber's parents. Maris stated in her opinion Amber was sexually abused.

Maris further testified she had worked with pedophiles and child abusers. She testified pedophiles and child abusers have sexual fantasies about children. Maris stated, "They see themselves as the children's friends, the one that really cares about the children. They relate to them in a sexual way and they don't see that as hurtful." Maris testified it would be consistent with the condition of pedophilia for an individual to have videotapes containing children's programs, children's books, children's clothing, children's toys, photographs, drawings, and pictures. Maris stated a pedophile would use these items for sexual stimulation and fantasy of children.

The State also offered the testimony of Charles William Belk, Sr., and Wendy Frazier, of the City of West Columbia Police Department. Belk testified he assisted investigator Frazier in the arrest of Nelson on September 29, 1992. Belk and Frazier interviewed Nelson. Belk testified Nelson indicated he was uncomfortable speaking in front of Frazier because he did not like adult women and could not trust them. With respect to Amber, Belk testified Nelson stated she was a precious little girl and that he loved her very much and did not want her hurt or anything to happen to her.

Belk testified Nelson voluntarily consented to a search of his residence. Belk stated he found two stuffed animals in

Nelson's bedroom closet, a Cookie Monster and an Oscar the Grouch. The State entered both into evidence without objection.

Belk further testified he interviewed Nelson on the morning of September 30, 1992. He testified Nelson stated he had had fantasies about small girls and children in general. Belk testified Nelson found children to be sweet and innocent and good and told him he idolized Punky Brewster and wished all women were as honest and sweet as she was.

Belk testified Nelson told him he had the opportunity to molest Amber but did not because he loved her too much and he did not want to see her hurt. Frazier also testified Nelson made that statement. Belk further testified Nelson stated he enjoyed playing games with Amber. Belk testified Nelson told him he enjoyed playing "Cookie Monster" and "doctor" with Amber. Belk testified when he asked Nelson what he meant by "playing doctor," Nelson just stared at him.

Frazier testified after the interview she and Belk searched Nelson's bedroom as well as James Nelson's bedroom. Frazier testified over objection there were fifty-eight videotapes, which included children's videotapes. A few of these were commercial tapes, but most of them were homemade.

The solicitor introduced over a defense objection the following thirteen exhibits, all of which were taken from Nelson's home: (1) a scrapbook of pictures of young girls dressed in underwear and gymnastics clothing, (2) a membership card to the Punky Brewster fan club, (3) a picture frame with a commercial sample picture of a young girl dressed in gymnastics clothing, (4) a laminated picture of a young girl lying on a couch, (5) a laminated advertisement of a young girl dressed in sleepwear, (6) a mobile with a young girl's picture, (7) a videotape containing segments of children's shows, particularly a segment teaching children about sexual abuse, (8) a laminated picture of a young girl taken from an advertisement, (9) a Punky Brewster coloring book, (10) a copy of *Grimm's Complete Fairy Tales*, specifically "The Fitcher's Bird Tale," a story about a wizard who takes young girls from their homes, as well as items inserted in the book, (a) a "Save The Children" advertisement used as a book marker; (b) an article entitled "Modern Day Monsters," which deals with children's sexual abuse, (11) six pictures of Punky Brewster,

(12) Nelson's birth certificate, and (13) a Cookie Monster doll.

The jury convicted Nelson of four counts of criminal sexual conduct with a minor in the first degree, and four counts of lewd act on a minor. Nelson was sentenced to thirty-years on each count of criminal sexual conduct with a minor in the first degree and ten years on each count of lewd act on a minor. The trial court ordered the sentences would run consecutively.

## I.

Nelson contends the trial court erred in allowing the State to introduce into evidence the items the police seized from his home because that evidence improperly placed Nelson's character in issue and tended to show only that he had a propensity to commit the crime charged.

Whether or not the evidence in question incidentally reflected poorly on Nelson's character, it was relevant to show Nelson's motive to commit the crimes for which he was charged. *State v. Bell*, 302 S.C. 18, 393 S.E. (2d) 364 (1990) (evidence of the defendant's bizarre sexual desires was admissible to show those desires gave him a motive to commit the crime with which he was charged); *see also Stamey v. State*, 194 Ga. App. 305, 390 S.E. (2d) 409 (1990) (copies of sexually oriented magazines found stored in the defendant's basement were admissible to show motive in prosecution for child molestation); *cf. State v. Bowen*, 48 Wash. App. 187, 738 P. (2d) 316, 319 (1987) (defining "motive" as an inducement or that which leads or tempts the mind to indulge a criminal act).

In *Bell*, the defendant was convicted of the murder and kidnapping of nine-and-a-half-year-old Debra Mae Helmick. At the time of his trial, Bell had already been convicted of the kidnapping and murder of seventeen-year-old Shari Faye Smith. During the time Shari had been missing, members of the Smith family had received a series of telephone calls from Bell. The police had recorded all but one of the calls.

In Bell's trial for Debra's kidnapping and murder, the trial court admitted, over objection, certain portions of the tapes. In one of the conversations the trial court admitted, Bell recounted to Shari's sister his sexual experiences with Shari. The supreme court held the trial court properly admitted the conversation because it demonstrated a possible sexual motive for Debra's kidnapping. The supreme court stated,

. . . Debra's body was discovered with an extra pair of adult female silk bikini underwear on top of her cotton children's underwear. Although Debra's body was too decomposed to ascertain whether sexual intercourse or the like had occurred, the existence of the adult underwear on the child was evidence that Bell was impelled to kidnap her for bizarre sexual reasons. Evidence of Bell's bizarre sexual motivations was properly considered by the jury.

*Id.* at 30, 393 S.E. (2d) at 370-71.

Here, as in *Bell,* the evidence in question tended to show the defendant had bizarre sexual desires that gave him a motive to commit the crime with which he was charged. Even if the evidence did reflect upon Nelson's character, any such reflection was incidental to the purpose for which the State offered the evidence.

Although we find the evidence was probative on the issue of motive, we must also determine whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. If the prejudicial effect outweighs its probative value, such evidence should be excluded. *Bell,* 302 S.C. 18, 393 S.E. (2d) 364 (1990). Whether the trial court committed prejudicial error must be determined on the basis of the record in its entirety and the result will generally turn on the facts of each case. *Id.* (where the prejudicial impact of the evidence did not outweigh its probative value).

Here, the evidence of the items seized at Nelson's home was highly probative on the issue of Nelson's guilt. Moreover, the evidence, although just as probative on the issue of motive as the evidence admitted in *Bell,* was far less prejudicial. In *Bell,* the evidence admitted showed the defendant not only had bizarre sexual *desires,* but had actually *acted* on those desires in the past. That was not the case in the present action. Considering the probative nature of the evidence in question, we find the danger of unfair prejudice did not outweigh the evidence's probative value. *Cf. State v. Johnson,* 306 S.C. 119, 410 S.E. (2d) 547 (1991) (in the defendant's trial for the murder of a state trooper, the State was properly allowed to introduce evidence that the defendant had murdered the owner and driver of a recreational vehicle where the first victim's body was

still in the recreational vehicle when the defendant was stopped; the evidence of the first murder and robbery reasonably tended to prove a motive and intent for committing the murder of the trooper, *i.e.*, to prevent the trooper from discovering the hidden body; the probative value of this evidence was not substantially outweighed by its prejudicial effect).[2]

## II.

Nelson also argues the trial court violated his rights to receive due process and to confront witnesses against him when it prevented him from cross-examining three D.S.S. employees concerning certain D.S.S. records.

Nelson subpoenaed as witnesses three employees of D.S.S. All three of the witnesses were either involved in investigating Amber's abuse or were the custodians of the records. Nelson claimed he had been given the records in question and there was information therein implicating persons other than Nelson, although he was also mentioned in the report. D.S.S. moved to quash the subpoenas on the ground S.C. Code Ann. § 20-7-690 (Supp. 1993) made it a misdemeanor to disseminate the records' contents. Nelson claimed D.S.S.'s position was based on a misinterpretation of the statute. The trial court ruled against Nelson. Nelson did not make a proffer of the records' contents for the record.

"It is well settled that a reviewing court may not consider error alleged in exclusion of testimony unless the record on appeal shows fairly what the rejected testimony would have been." *State v. Roper*, 274 S.C. 14, 20, 260 S.E. (2d) 705, 708 (1979); *see also State v. Cabbagestalk*, 281 S.C. 35, 314 S.E. (2d) 10 (1984) (failure to make an offer of proof prevents the appellate court from determining whether the exclusion of testimony is prejudicial and thus precludes the appellant from raising the issue on appeal); *Hendrix v. Eastern Distribution, Inc.*, 320 S.C. 218, 464 S.E. (2d) 112 (1995) (the court of appeals should not address the merits of an issue not preserved for review).

Here, Nelson claims he was prevented from making a proffer because the trial court did not allow him to question the

---

[2] Because we affirm on this ground, we do not address the State's other arguments concerning the admissibility of the evidence in question.

D.S.S. employees at all after they asserted their statutory privilege. *See State v. Schmidt*, 288 S.C. 301, 342 S.E. (2d) 401 (1986) (where the trial court refused to allow the proffer, but we can determine from the record what the testimony was intended to show, we will address the merits). We note, however, Nelson admitted the records were in his possession and he therefore could have proffered the records himself. Because Nelson failed to do so, there is nothing in the record to support his claim on appeal that he was prejudiced by the trial court's ruling against him.

As for Nelson's claims that the trial court's ruling violated his rights under the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment, these claims were neither raised to not ruled upon by the trial court and therefore may not be raised for the first time on appeal. *State v. Williams*, 303 S.C. 410, 401 S.E. (2d) 168 (1991).

Affirmed.

CURETON and HEARN, JJ., concur.