489 S.E.2d 657

**The STATE, Respondent,**

v.

**Clair E. LUCKABAUGH, Appellant.**

**No. 2689.**

Court of Appeals of South Carolina.

Heard June 3, 1997.

Decided June 30, 1997.

Rehearing Denied Sept. 3, 1997.

496

Deputy Chief Attorney Joseph L. Savitz, III, of SC Office of Appellate Defense, Columbia, for appellant.

Attorney General Charles Molony Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Columbia; and Solicitor David P. Schwacke, Charleston, for respondent.

GOOLSBY, Judge.

This is a criminal case. The trial court sentenced Clair E. Luckabaugh to ten years imprisonment following his conviction by a jury of third-degree assault with intent to commit criminal sexual conduct. The questions on appeal relate to the admission of certain evidence. We affirm.

## FACTS

On May 17, 1994, the Medical University of South Carolina (MUSC) admitted Mina Thompson as a patient. Thompson,

then twenty-two, suffered severe brain damage as a result of having been beaten during a robbery at her place of employment. She was in and out of consciousness and unable to speak. Thompson also wore restraints.

Dr. Kris Stegman, one of Thompson's treating physicians, received two calls around midnight on June 17, 1994, advising him that Thompson had vomited. He arrived at the hospital about an hour and a half later and went to Thompson's room to check on her. He found the door to Thompson's room closed. A note taped to the door advised she was bathing. Stegman thought the note odd because doors to the rooms of head-injury patients were not closed in the middle of the night, patients were ordinarily not bathed at that hour, and only hospital personnel would be at the hospital at that time of night.

Stegman tapped lightly on the door and, hearing no reply, entered the room. There he saw Thompson, lying near the left, bottom edge of her bed with her buttocks completely exposed. He also saw Luckabaugh, a male nurse, standing at Thompson's bed, his hips aligned with Thompson's buttocks. Thompson's restraints had been undone.

Luckabaugh appeared noticeably shaken and his hands trembled nervously as he attempted to push Thompson back into her bed and cover her up. When Stegman asked Luckabaugh what was going on, Luckabaugh said Thompson had vomited and he had been cleaning her. Stegman, however, neither smelled nor saw any vomit. He saw only some greenish substance on Thompson's tracheostomy collar in an amount so small it could have been easily wiped off. Luckabaugh wore no gloves, a precaution usually taken when a nurse cleans a patient or changes a diaper. Also, Stegman saw nothing to indicate Thompson was being bathed and saw neither fresh sheets nor a fresh gown in Thompson's room.

As Stegman moved closer to the bed, he saw Luckabaugh's pants zipper was open. At that point, Luckabaugh turned his back on Stegman, moved both his hands to his crotch, and made a vertical movement. As he did so, Stegman heard the sound of a zipper. Stegman also noticed Luckabaugh appeared to have an erection.

With Luckabaugh out of the room, Stegman identified himself to Thompson. She squeezed his hand tightly after he placed his hand in hers. Stegman asked Thompson "if everything was okay." She "shook her head no."

An MUSC investigator, Lieutenant Robert Brown, later questioned Luckabaugh. Luckabaugh wore a "fanny pack" when Brown questioned him and denied any wrongdoing. He specifically denied having his pants unzipped when Stegman came into Thompson's room. Luckabaugh told Brown the zipping sound heard by Stegman was caused by his zipping the fanny pack shut.

After the police arrested Luckabaugh, a finance company repossessed Luckabaugh's mobile home and had some of its employees box up his belongings for storage. A member of the packing crew thought some of the material found in Luckabaugh's home looked suspicious and voiced his concern to his supervisor. The supervisor contacted the sheriff's department, and sheriff deputies, after examining the material, seized a number of items. The State placed some of these items into evidence at Luckabaugh's subsequent trial.

## DISCUSSION

### I.

■ The first question Luckabaugh raises concerns the testimony of the witness Edmonde Towner. He argues the trial court should not have allowed her testimony because it was not clear and convincing. *See State v. Smith,* 300 S.C. 216, 387 S.E.2d 245 (1989) (evidence of prior bad acts that did not result in a conviction must be established by clear and convincing evidence).

Towner, a deaf, seventy-year-old former Swiss citizen who spoke only French, testified at trial, with her sister, Juliette Cato, translating for her. Towner, through Cato, testified in front of the jury that, while she was a patient at MUSC, Luckabaugh, on Saturday, May 14, 1994, came into her hospital room and pulled her panties all the way down while giving her a shot in the hip. Towner further testified that the next evening she awoke from her sleep in her darkened, closed hospital room when she felt the bed shake and someone

spread her legs and caress her around her crotch. After she pressed a call button by her bed, Towner saw Luckabaugh leave her room.

Cato herself testified Towner appeared extremely upset on Monday, May 16, 1994, when she visited with Towner at the hospital and saw blood on her sister's hand. She further testified Towner had told her about a struggle with Luckabaugh and had referred to him as "a pig."

At no time during Towner's testimony did Luckabaugh offer any contemporaneous objection based upon her testimony being less than clear and convincing. The issue, therefore, is not preserved for our review.[1] *State v. Hoffman*, 312 S.C. 386, 440 S.E.2d 869 (1994); *State v. Vanderbilt*, 287 S.C. 597, 340 S.E.2d 543 (1986).

## II.

Luckabaugh next challenges the trial court's admission of evidence taken from his trailer home. This evidence consisted of (1) certain drugs and medical instruments taken from his trailer home and the testimony of an expert witness concerning them and (2) pages from detective magazines found in

---

1. Luckabaugh objected during an *in limine* hearing to Towner's and Cato's testimony on the ground their testimony did not satisfy the clear and convincing standard required for evidence of a prior bad act not resulting in a conviction. Towner testified Luckabaugh on May 13 or 14, 1994, "had pulled her panties down to give her a shot" and on May 14 or 15, 1994, she saw Luckabaugh leaving her room and noticed "flesh under his pants" after she had felt tickling or caressing between her legs. Cato testified Towner appeared upset on May 16, 1994, and her sister's hand bled from an improperly inserted IV needle. She said Towner told her Luckabaugh had touched and hurt her and Towner called Luckabaugh "a pig." The trial court deemed the evidence clear and convincing and, therefore, admissible if the State later offered it into evidence in the jury's presence. Luckabaugh, however, did not object, as he was required to do to preserve the issue, when the State called Towner to testify before the jury. *State v. Schumpert*, 312 S.C. 502, 435 S.E.2d 859 (1993); *see also State v. Moultrie*, 316 S.C. 547, 451 S.E.2d 34 (Ct.App.1994) (holding a defendant failed to preserve for review his claim that the trial court erred in admitting evidence of his prior bad acts even though he challenged the admission of the prior bad acts in a pretrial motion *in limine* and he renewed his motion *in limine* before the state presented its case where he failed to obtain a ruling from the trial court on the issue).

500

Luckabaugh's trailer and excerpts from stories Luckabaugh had written.

## A.

■ Luckabaugh attacks the admissibility of the drugs and of the medical instruments and the testimony of an expert witness concerning these items on the ground of relevance.

Luckabaugh's brief describes the drugs in question as drugs used "to put someone under sedation and then take them out of sedation, [and] maintain them while under sedation" and the medical instruments in question as "medical implements, such as syringes, vaginal specula, bladder catheters, and. enema equipment." The State's expert, Dr. Roger A. Russell, a pathologist and toxicologist, after describing the drugs and the medical instruments and what they are used for, testified that he could offer no legitimate reason for a registered nurse to have "a collection like this" in the home and that he himself was a physician and did not have such items in his home.

We deem the evidence relevant, as that term is defined in Rule 401, SCRE, in that it made more probable a significant fact at issue in the case. The evidence addressed the question of what Luckabaugh's intent was regarding Thompson at the time Stegman walked into Thompson's room. Was his intent to commit a sexual battery upon a helpless female or was it, as he claimed, simply to clean vomit off Thompson? Lucka-baugh's peculiar possession of drugs used for sedative pur-poses and of medical instruments used for invasive procedures increased the probability that his intent was, as the State argued, to do the former. This evidence showed he harbored an interest in invasive contact with the persons of those in a defenseless state, particularly, as suggested by *his* possession of vaginal specula, women. *See* Rule 404(b), SCRE ("Evi-dence of other . . . acts . . . may . . . be admissible to show motive . . . or intent. . . .").

Moreover, the fact that Luckabaugh was never accused of using the drugs or the medical instruments on anyone would not make this evidence any less relevant to the central issue in the case, namely, his alleged intent to commit a sexual battery. *See State v. Nelson,* 322 S.C. 377, 471 S.E.2d 767 (Ct.App. 1996) (criminal sexual conduct case in which the court of

appeals upheld the trial court's admission of evidence that the defendant possessed, among other things, a Cookie Monster doll and a videotape containing segments of children's shows, holding the disputed evidence was relevant to the issue of motive), *cert. granted* (February 7, 1997); *Ward v. State,* 262 Ga. 293, 417 S.E.2d 130 (1992) (murder case involving a female victim and a male defendant wherein the court held extrinsic evidence consisting of, among other things, lingerie, adult magazines, newspaper clippings about rapes, murders, and missing women, and drivers licenses and insurance cards belonging to various women, showed the defendant was obsessed with having control and dominance over women and was therefore relevant to explain the nature of the crime and to prove identity by establishing motive), *cert. denied,* 506 U.S. 1085, 113 S.Ct. 1061, 122 L.Ed.2d 366 (1993); *Felker v. State,* 252 Ga. 351, 314 S.E.2d 621, 631 (1984) (" 'The ultimate issue in determining the admissibility of evidence of other crimes is not mere similarity but relevance to the issues in the trial of the case.' " (quoting *Williams v. State,* 251 Ga. 749, 312 S.E.2d 40, 71 (1983))), *cert. denied,* 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984); *cf. State v. Bell,* 302 S.C. 18, 393 S.E.2d 364 (1990) (murder case wherein the supreme court upheld the trial court's admission of women's underwear that was found in the male defendant's bedroom and was similar to the kind found on the victim's body), *cert. denied,* 498 U.S. 881, 111 S.Ct. 227, 112 L.Ed.2d 182 (1990); *State v. Lyle,* 125 S.C. 406, 118 S.E. 803 (1923) (evidence of prior bad acts is admissible to prove, among other things, motive or intent).

## B.

■■■ Luckabaugh also attacks on the ground of undue prejudice the admissibility of the drugs and of the medical instruments and the testimony of an expert witness concerning these items, as well as the admissibility of Luckabaugh's fiction and the detective magazine materials.

The exhibits representing Luckabaugh's fiction consisted of three excerpts from two stories that he authored. These stories, as his brief describes them, deal with "bondage, rape, and enemas performed on unconscious women." We would add they do so graphically.

The exhibits from the detective magazine material consisted of (1) a cover page on which appears, next to a headline that reads, "Angel of Death in the Children's Ward," a picture of a nurse preparing to give a child an injection; (2) a page on which appear a photograph of the body of a naked woman tied spread-eagled to a bed and the caption "Chula Vista sleuths teamed up with Mexican officials to nail the sicko who liked to drug his victims and then have sex with them while they were unconscious ... or dead!"; and (3) a page on which appear a photograph of a female homicide victim and the beginning of a story about a male health-care worker who discovers the "crumpled," "seminude" body of a woman.

The trial court must balance the probative value of the evidence in dispute against its prejudicial effect. *State v. Parker*, 315 S.C. 230, 433 S.E.2d 831 (1993). "[W]here the evidence is of such a close similarity to the charged offense that the previous act enhances the probative value of the evidence so as to 'overrule the prejudicial effect,' it is admissible." *Id.* at 233, 433 S.E.2d at 832 (quoting *State v. McClellan*, 283 S.C. 389, 392, 323 S.E.2d 772, 774 (1984)). The question of whether the trial court committed prejudicial error in admitting the questioned evidence must be determined on the basis of the entire record and "generally turn[s] on the facts of each case." *Bell*, 302 S.C. at 30, 393 S.E.2d at 371.

Here, the drugs, the medical instruments, the expert testimony about the peculiarity of Luckabaugh's possession in his home of the drugs and of the medical instruments, the excerpts from Luckabaugh's stories, and the detective magazine materials, all as indicated above, were probative of the State's contention that Luckabaugh, a male health-care worker, intended to sexually assault Thompson, a defenseless female patient in his care. This evidence dealt with substances to render and keep a person unconscious, with medical implements to invade a person's body, specifically a female's body, with possession of drugs and medical instruments ordinarily kept only at a hospital, with fantasies about sexual assaults on unconscious or otherwise disabled females, and with real-life stories involving nurses, bondage, naked or seminude females, and sex—in short, articles and things that would serve to enable, sustain, or feed the bizarre sexual conduct with which Luckabaugh was charged. We cannot say, then, considering

the whole record, that "the danger of unfair prejudice" of this evidence "substantially outweighed" "its probative value" or that the trial court erred in not excluding it. Rule 403, SCRE; *see Nelson,* 322 S.C. at 382, 471 S.E.2d at 770 (upholding the admission into evidence of pictures, toys, and other items in the defendant's possession pertaining to children on the ground the evidence tended to show the defendant entertained bizarre sexual desires that would motivate him to commit the crime with which he was charged and the prejudicial effect of the evidence did not outweigh its probative value); *see also State v. Benasutti,* 1996 WL 402254 (Ohio Ct.App.1996) [2] (a murder case wherein the court, considering the whole record, refused to hold that any prejudicial effect of admitting into evidence books in the defendant's possession about serial killers outweighed the probative value concerning the defendant's intent).

**AFFIRMED.**

HOWELL, C.J., and ANDERSON, J., concur.

---

2. Rule 2(G)(2) of the Ohio Supreme Court Rules for the reporting of opinions allows its courts, subject to certain qualifications not applicable here, to consider an unpublished opinion as persuasive authority.