562 S.E.2d 663

**The STATE, Respondent,**

v.

**Joseph GOLSON, Appellant.**

**No. 3465.**

Court of Appeals of South Carolina.

Heard March 6, 2002.
Decided March 25, 2002.
Rehearing Denied May 15, 2002.

422

Assistant Appellate Defender Robert M. Dudek, of SC Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka and Senior Assistant Attorney General William Edgar Salter, III, all of Columbia; and Solicitor Donald V. Myers, of Lexington, for respondent.

PER CURIAM.

The Lexington County Grand Jury indicted Joseph Golson for murder in connection with the death of Alice McIver. The jury returned a verdict of guilty and the trial judge sentenced Golson to life imprisonment. Golson appeals. We affirm.

## Facts/Procedural History

In October 1998, Golson was living with his wife in Wagner, South Carolina, but had been involved in a relationship with the victim, Alice McIver, for several years. McIver and her fifteen-year-old daughter lived in a mobile home in Lexington County.

Billie Jean Elmore, McIver's friend, testified Golson visited McIver on the weekends at her mobile home. McIver would also sometimes accompany Golson, a truck driver, on his trips. McIver gave Golson two guns, including the murder weapon. Elmore claimed, however, that McIver did not like guns and did not keep them in her home.

Shortly after 8:00 p.m. on October 3, 1998, Elmore and McIver went to dinner. They left the restaurant at approximately 10:30 p.m. and went to Elmore's house. McIver left Elmore's house at 11:30 p.m. and called her at 12:00 a.m. to let Elmore know she had arrived home. During that telephone conversation, McIver asked Elmore to tell Golson they had been out to dinner together. According to Elmore, Golson

was always jealous and often accused McIver of being unfaithful. Elmore testified she heard Golson in the background refusing to talk to Elmore and stating she would lie for McIver. Elmore, who was not alarmed by Golson's behavior, hung up the telephone, and went to sleep.

Eddie Ryan Hayden, who lived less than one mile from McIver's house, testified someone knocked on his door between 11:30 p.m. on October 3 and 12:30 a.m. on October 4. Hayden did not answer the door, but looked out of his window. He saw someone wearing a white T-shirt and jeans running up his driveway. He "didn't think too much of it and went back to sleep." Approximately one hour later, Golson telephoned Hayden and asked whether he could park his truck in Hayden's yard. Hayden agreed and, although he could "pretty much tell by [Golson's] voice there was something wrong," he went back to sleep.

At approximately 2:00 a.m. on October 4, Officer Johnny Bryant of the Lexington County Sheriff's Department was dispatched to McIver's residence concerning a shooting. He arrived at the home at approximately 2:16 a.m. Three other deputies were already at the scene. Shortly thereafter, Golson drove up to McIver's home in the cab of his truck. Golson, who was wearing a white T-shirt and jeans, exited the vehicle. Bryant approached Golson. After a brief conversation, Bryant placed Golson under arrest, read him his *Miranda*[1] rights, and placed him in Officer Terry Snead's patrol car.

The other officers entered the mobile home and discovered McIver's body on a bed, covered with a comforter. McIver had been shot in the chest above her left breast. She had no pulse. The officers found an open-levered rifle on the floor in the bedroom with one spent round next to it. There were also six live shell casings on the bedroom floor. The bedroom door had sustained what appeared to be fresh damage.

Golson remained in the patrol car for over an hour while the officers were in the residence. Golson talked to himself while sitting in the car. Unbeknownst to Golson, a video camera operated while he sat in the vehicle. At approximately 4:00

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

a.m., Snead transported Golson to the Lexington County Detention Center in his patrol car.

The trial court held a pre-trial hearing on the admissibility of Golson's statements to the police on the night of the incident. At the hearing, Bryant testified that on the night of the shooting, Golson drove to McIver's home, got out of his truck, and approached Bryant. Bryant inquired as to whether he could help Golson, and Golson responded "I did it. I did it. I did it." On cross-examination, the following occurred:

Q. When he got out, what he actually said was, "I did it. We were tussling over the gun and it went off."

A. As he approached me, his exact words were, "I did it. I did it. I did it." I asked him, "Did what?"

"I shot her. I think she may be dead." While I was handcuffing him, he may have said something to that effect.

Q. I will let you look at your statement because you say in your statement that you gave or you signed off on, J. Bryant, it says, "Did what?" He said, "We were tussling over the gun and it went off."

A. It says here, "Did what?" Subject stated, "I shot her. I think she may be dead." R.O., that being myself.

Q. Right.

A. "Began placing the subject in investigative detention," which is handcuffing, "and that's when he stated, 'We were tussling over the gun.'"

Q. "And it went off?"

A. Yes, sir.

Q. So what he actually said to you was, "I did it." And when he got more definitive, what he said he did was tussle over the gun and it went off; correct?

A. That was after he was being placed in handcuffs, yes, sir.

Q. But it was within a minute or two of the same conversation, within a couple of minutes or two?

A. Yes, sir.

Q. In fact, it was all part of the same conversation?

A. Yes, sir.

Officer Yvonne Lofton, the receiving officer at the Detention Center, testified at the hearing that she observed blood on Golson's hand and shirt and asked him whether he needed medical attention. According to Lofton, Golson said "It's not my blood. It's hers. I was aiming at her shoulder—." Lofton admitted, however, that she memorialized Golson's statements on the night in question, but her initial written account did not mention Golson's use of the word "aim." Lofton stated she added that fact when she rewrote the statement.

Officer Cave, who took Golson for a shower at the detention center, testified at the hearing and related Golson's statement that he "thought it was going to hit her in the shoulder, not in the middle of the chest; that he loved her." Cave also stated that "[a]t one point, [Golson] did say it was an accident." Cave memorialized Golson's statement as soon as Golson finished his shower and was secured. On cross-examination, Cave acknowledged Golson's speech was unclear and he had difficulty understanding him. Cave also admitted Golson made conflicting statements and at one point said the whole thing was an accident.

The solicitor maintained the State intended to introduce only those statements Golson made while at the Detention Center, because any statements made to Bryant at the scene of the shooting were "basically self-serving hearsay" and not admissible under *State v. Terry*, 339 S.C. 352, 529 S.E.2d 274 (2000). Defense counsel argued *Terry* does not stand for the proposition that all self-serving hearsay statements are inadmissible. Defense counsel also argued that statements Golson made at the Detention Center should not be admitted into evidence because: (1) Lofton failed to include part of Golson's statement in her initial memorialization, (2) the written statement was not provided to the defense in violation of Rule 5, SCRCrimP, and (3) Cave admitted Golson's speech was unclear at the time the statements were made.

The trial court ruled the statements Golson made to Bryant were inadmissible under *Terry*, and that the statements Golson made to Lofton and Cave were admissible. The court specifically noted that any inconsistencies between writings Lofton and Cave made immediately following Golson's state-

ments at the Detention Center and their testimony about the statements at trial would be subject to cross-examination and would affect the credibility of the officers' testimony, not the admissibility of the statements.

The case proceeded to trial. During cross-examination of Bryant, defense counsel attempted to elicit testimony regarding statements Golson made to Bryant at the crime scene. The solicitor objected, and the trial court refused to allow the statements.

Lofton testified Golson told her: "It's not my blood. It's from what I did to the other person." She further testified Golson "stated that he aimed at her shoulder, but it was an accident and he should have shot her in the shoulder." On cross-examination, Lofton admitted she wrote her statement about Golson three to five times that night, but forgot to include any mention of Golson stating he aimed the rifle. She further admitted she was "rewriting real quick because [she] was getting off [from work]." Defense counsel also elicited testimony to the effect that Golson was not aware until the day of trial that she would testify he stated he aimed the rifle.

Cave testified Golson stated he "thought it was going to hit her in the shoulder, not in the center of her chest. At other times he would say that he loved her. At one point he said it was an accident. He was saying how he should have shot himself and laid down next to her, but he didn't have the guts to."

Dr. Joel Sexton, a forensic pathologist, testified McIver bled to death after being shot in the chest with a rifle. He opined the gunshot wound was a "distant wound" which could have been caused by a shot fired from eighteen inches to three feet away from the victim. Further, Dr. Sexton testified McIver's wound and the projection of the bullet indicated McIver's arms were at her sides when she was shot. He could not, however, categorically rule out the possibility that McIver's hand slipped off the gun immediately before it was discharged.

Golson testified in his own defense. He stated he began trying to break off his relationship with McIver six months before the night of the shooting. He said that on October 3, 1998, he called McIver to tell her he was coming to her home that night to pick up his clothes. According to Golson's

account, he arrived at McIver's home at approximately 12:30 a.m. on October 4, 1998, knocked on the window, and McIver opened the door to let him inside. According to Golson, McIver did not want him to return home to his wife. Golson stated McIver "went into a rage and went to the closet and got the gun. Then I went behind and we started tussling with it. . . ." Golson testified McIver threatened to kill him before she would let him leave her. Golson claimed he was ejecting shells from the gun when McIver grabbed the barrel and: "All of a sudden, I felt the pressure of the gun got light; and it was a boom and it was all over with."

After the shooting, Golson called 911. Golson testified he told the operator he and McIver were tussling with the gun when it discharged. He denied telling law enforcement officials he aimed the gun at McIver's shoulder.

On cross-examination, Golson testified he did not remember saying aloud while sitting alone in the patrol car: "Why did you take the gun, Joe? Why did you do it? Why didn't you leave the f---ing gun behind your seat?" "Why didn't you shoot her in the foot, Joe? Why didn't you shoot her in the leg?" "God please forgive me. I sinned." Regarding his inability to remember any statements he might have made while in the patrol car, Golson stated "I was out of it, sir. I don't know what I was saying in that car. All I know I was butting my head and just looking for somebody to come and kill me with all the people that was around. . . . Like I said, I was out of my mind. I have no recollection of it, sir."

Over defense counsel's objection, the jury was allowed to view selected segments of the patrol car's video tape. The court also allowed into evidence, over the State's objection, a segment of the tape wherein Golson said "God, I am sorry. I did not mean to do it. God, it was an accident. If she hadn't grabbed the damn gun, it never would have went off."

After closing arguments, the judge charged the law of murder, involuntary manslaughter, and accident. The jury requested to view the video tape and Golson's testimony again. The court granted the jury's request and deliberations resumed. The jury convicted Golson of murder. This appeal followed.

## Discussion

■ On appeal, Golson argues the trial judge erred in relying on *State v. Terry* to exclude Golson's statement to Bryant that he and McIver were tussling over the gun when it discharged. We agree the trial court erred in refusing to admit the evidence pursuant to *Terry*. However, we find this error harmless.

In *State v. Terry*, 339 S.C. 352, 355–57, 529 S.E.2d 274, 276–77 (2000), our Supreme Court held that a defendant who elected not to testify in accordance with his Fifth Amendment privilege against self-incrimination was not "unavailable" within the meaning of Rule 804(b)(3), SCRE.[2] Thus, the defendant, who was charged with capital murder, could not introduce his confession, which suggested he was guilty of manslaughter rather than murder, as a statement against penal interest. The Court reasoned that the defendant was attempting to exculpate himself with a confession, and a defendant seeking to make exculpatory statements must face cross-examination unless corroborating circumstances clearly indicated the trustworthiness of the statements.

Unlike the defendant in *Terry*, Golson testified in his own defense. He did not render himself unavailable as a witness by virtue of the exercise of his Fifth Amendment privilege against self-incrimination. The prosecution was afforded ample opportunity to, and did in fact, cross-examine Golson. We find the holding in *Terry* did not control the evidentiary issue in this case, and the trial court erred in so finding.

■ This trial error, however, is subject to a harmless error analysis. *See State v. Mouzon*, 326 S.C. 199, 204, 485 S.E.2d 918, 921 (1997) (holding trial errors are subject to a harmless error analysis).

---

**2.** Rule 804(b)(3) provides:

(3) Statement Against Interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

[I]n order for this Court to reverse a case based on the erroneous admission or exclusion of evidence, prejudice must be shown. *State v. Bell,* 302 S.C. 18, 393 S.E.2d 364 (1990). "Whether error is harmless depends on the circumstances of the particular case. No definite rule of law governs this finding; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case. Error is harmless when it 'could not reasonably have affected the result of the trial.'" *State v. Mitchell,* 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985), *citing State v. Key,* 256 S.C. 90, 93, 180 S.E.2d 888, 890 (1971).

*State v. Taylor,* 333 S.C. 159, 172, 508 S.E.2d 870, 876 (1998).

■ Admission of Golson's statement to Bryant on the night of the shooting relating that he and McIver were tussling with the gun would have advanced his claim that the shooting was accidental. We note, however, that Golson testified as to the circumstances surrounding the shooting, including his claim he was ejecting shells from the rifle when McIver grabbed the barrel of the gun and it discharged. Bryant acknowledged the dispatcher informed him Golson reported the incident to the 911 operator. Golson related his statement to the 911 operator that the shooting was accidental. Cave testified Golson claimed the incident was an accident. Also, the portion of the video tape implying the shooting was accidental was presented to the jury. Accordingly, the admission of the statements to Bryant would have been cumulative. Given that the evidence of the accidental nature of the shooting was before the jury, we find the trial court's refusal to admit Golson's statements to Bryant was harmless error. *See State v. Joseph,* 328 S.C. 352, 371, 491 S.E.2d 275, 284 (Ct.App. 1997) (stating where evidence is merely cumulative to other evidence admitted at trial, the exclusion of such evidence is not an abuse of discretion).

Moreover, there is overwhelming evidence in the record from which the jury could have determined Golson's guilt, including Elmore's testimony regarding Golson's jealous nature and statements on the night of the shooting, the testimony of the forensic pathologist indicating the shooting did not occur at close range as would be the case in a shooting resulting from a "tussle" with the weapon, and the testimony

of law enforcement officials regarding Golson's statements on the night of the shooting. Golson's own statements while sitting alone in the police patrol vehicle on the night of the shooting belie the version of events he advanced at trial. In light of the overwhelming evidence of guilt, we hold the exclusion of Golson's statement to Bryant was harmless. *State v. Reeves,* 301 S.C. 191, 194, 391 S.E.2d 241, 243 (1990) (Error is harmless when it could not reasonably have affected the result of the trial.).

For the foregoing reasons, Golson's conviction is

**AFFIRMED.**

CURETON, GOOLSBY and ANDERSON, JJ., concur.