492 S.E.2d 393

**The STATE, Respondent,**

v.

**David L. GLENN, Appellant.**

No. 2678.

Court of Appeals of South Carolina.

Heard April 8, 1997.

Decided June 9, 1997.

Refiled Sept. 19, 1997.

Ivan J. Toney, Anderson, for appellant.

Attorney General Charles Molony Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, and Senior Assistant Attorney General Norman Mark Rapoport, Columbia; and Solicitor George M. Ducworth, Anderson, for respondent.

HOWELL, Chief Judge:

David L. Glenn appeals from his conviction for assault and battery with intent to kill. We affirm.

## I.

Sara LeCroy lives approximately four miles from Interstate 85 on Old Dobbins Bridge Road in Anderson County. Glenn lives in the same area as LeCroy.

In March 1994, LeCroy removed a white porcelain toilet from her house and placed it in her yard behind the mailbox. LeCroy and her daughter-in-law placed potting soil in the toilet and planted flowers in it. On Saturday night, April 9,

1994, the toilet was still in LeCroy's yard. Sometime after midnight that night, LeCroy was awakened by a loud car or truck "taking off." The next morning, the toilet was gone.

At approximately 2:00 a.m. on Sunday, April 10, 1994, Gene Allen was traveling northbound on Interstate 85. He was driving a tractor trailer from Gainesville, Georgia, to Sagamore Beach, Massachusetts. As he approached an interstate overpass at the five-mile marker in Anderson County, Allen saw two young white males and a car on the overpass. One of the men was standing at the front of the car, while the other was standing at the rear of the car on the passenger side. As Allen was coming to the overpass, his vehicle was hit by a large white object, coming through the windshield and roof of the tractor. Although Allen was severely injured,[1] he managed to stop his rig. Allen testified that he never actually saw the object before it hit his truck; however, the record makes clear that the object was a toilet containing some fertilizer or potting soil.

Michael Ingle, another truck driver, testified that he was driving on the interstate that same night and encountered a car door lying in the highway. Ingle went to a truck stop and called the police to inform them about the debris on the road. At approximately 2:00 a.m., Ingle returned to the interstate, where, near the five-mile marker, he saw Allen's truck pulled over on the side of the road. Ingle helped Allen out of his truck and drove him to the hospital. Ingle testified that he observed broken pieces of white porcelain in Allen's truck and on the roadway.

Allen's truck was towed from the scene by a local towing company. The trucking company then picked up the truck and returned it to its terminal in Norcross, Georgia.

After hearing about the incident, Larry Duckett, Glenn's cousin, contacted the victim and the police, telling them that Glenn was the only person in the community that Duckett thought might be capable of committing the crime. Duckett reached this conclusion because, sometime during the previous year, Glenn told Duckett that he had been throwing items at

---

1. Allen was hit in the chest and stomach and his right arm was nearly severed in the accident. He spent four days in the hospital and was out of work for eleven months.

moving vehicles. According to Duckett, Glenn thought his pranks were funny. Glenn also told Duckett that he wondered what it would feel like to kill someone.

Officer Tim Jones of the Anderson County Sheriff's Department began investigating the case on Monday, April 11, 1994. He testified that there were numerous pieces of the shattered toilet in the median and emergency lane of the interstate. As to the railing on the overpass in question, Jones stated "it looked like someone had taken their hand and taken it like this on the bridge rail and wiped it off. You know, it was like eight fingers swiped on it. It looked like it was potting soil." Jones further testified that he and Sergeant Frank Kirkman travelled to Norcross to view Allen's truck. Jones observed numerous pieces of white porcelain and what appeared to be potting soil inside the truck.

Sergeant Kirkman, who was in charge of the forensic unit, testified that he collected several pieces of porcelain from inside the truck. He also stated that he observed a material appearing to be potting soil inside the truck. Kirkman processed a piece of the porcelain for fingerprints and turned the porcelain over to the evidence custodian. Deputy Sheriff Buddy Ellison, the evidence custodian, testified that he received a particular piece of the porcelain toilet bowl from Sergeant Kirkman on April 14, 1994. Ellison stated it had been stored in a locked evidence closet since that time. The trial court admitted the fragment into evidence over Glenn's objection. Sergeant Kirkman then testified that a fingerprint he raised from the porcelain fragment matched a known fingerprint of David Glenn.

Several days after the incident, and after Glenn's fingerprint was recovered from the porcelain fragment, Detective Jones interviewed Glenn. Glenn gave a written statement in which he denied any connection to the incident. According to Glenn, he went out with his wife on the night in question and returned home around 9:00 p.m. A friend, John Hayes, came by Glenn's house later that night, but they did not go anywhere. Glenn stated that he went to work the following morning about 7:00 a.m. Glenn denied throwing the commode off the bridge. Although Glenn had been in LeCroy's home

more than eight years prior to the incident, Glenn specifically denied having any contact with LeCroy's commode.

## II.

■ On appeal, Glenn first argues that the trial court erred by admitting the porcelain fragment from which Glenn's fingerprint was obtained. According to Glenn, because the State did not present the testimony of the first officer on the scene of the accident, the State failed to properly establish the chain of custody of the porcelain fragment from the time it came into the possession of the police. Moreover, Glenn argues that, because the police never had custody of the truck from which the fragment was obtained and did not retrieve the fragment until a day after the crime, "the State failed to establish safe-keeping of the evidence and the State failed to establish a complete chain of custody." We disagree.

Because fungible items such as drugs or blood samples are not readily identifiable and may be easily tampered with, the party offering such items into evidence must establish a chain of custody as far as practicable. *See, e.g., State v. Cribb,* 310 S.C. 518, 426 S.E.2d 306 (1992); *Benton v. Pellum,* 232 S.C. 26, 100 S.E.2d 534 (1957); *State v. Johnson,* 318 S.C. 194, 456 S.E.2d 442 (Ct.App.1995), *cert. denied* (December 8, 1995). Where the analyzed substance has passed through several hands, the evidence must not leave it to conjecture as to who had it and what was done with it between the taking and analysis. However, the proof of chain of custody need not negate all possibility of tampering, but instead must only establish a complete chain of evidence as far as practicable. *State v. Williams,* 297 S.C. 290, 376 S.E.2d 773 (1989); *Johnson,* 318 S.C. at 196, 456 S.E.2d at 443.

While the chain of custody requirement is strict where fungible evidence is involved, where the issue is the admissibility of non-fungible evidence—that is, evidence that is unique and identifiable—the establishment of a strict chain of custody is not required:

> If the offered item possesses characteristics which are fairly unique and readily identifiable, and if the substance of which the item is composed is relatively impervious to change, the trial court is viewed as having broad discretion to admit

merely on the basis of testimony that the item is the one in question and is in a substantially unchanged condition. On the other hand, if the offered evidence is of such a nature as not to be readily identifiable, or to be susceptible to alteration by tampering or contamination, sound exercise of the trial court's discretion may require a substantially more elaborate foundation. A foundation of the latter sort will commonly entail testimony tracing the "chain of custody" of the item with sufficient completeness to render it reasonably probable that the original item has neither been exchanged with another nor been contaminated or tampered with.

John W. Strong, 2 *McCormick on Evidence* § 212 at 527 (4th ed. 1992); *accord Gadson v. Georgia,* 263 Ga. 626, 437 S.E.2d 313, 314 (1993) ("Distinct physical objects that can be identified and differentiated by the senses of observation are not subject to the 'chain of custody requirement.'"); *North Carolina v. Campbell,* 311 N.C. 386, 317 S.E.2d 391, 392 (1984) ("A detailed chain of custody need be established only when the evidence offered is not readily identifiable or is susceptible of alteration and there is reason to believe that it may have been altered.").

In this case, the challenged porcelain fragment was unique and readily identifiable. Thus, the State was not required to establish a strict chain of custody in order to admit the porcelain fragment. Instead, the fragment was admissible upon a proper showing of relevance and identification. *See, e.g., State v. Foster,* 260 S.C. 511, 197 S.E.2d 280 (1973) (Affirming the admission of tools that were identified by police through markings and were properly connected to the defendants and the crime). Here, several witnesses testified that Allen's truck was littered with porcelain fragments, and Sergeant Kirkman identified the fragment as one he seized from the truck. This testimony was sufficient to render the fragment relevant and admissible. While any gaps in the custody of the fragment may go to the credibility of the evidence, they simply do not affect its admissibility. *See State v. Wells,* —— S.C. ——, ——, 426 S.E.2d 814, 817 (Ct.App.1992) (Affirming the admission of clothes seized from the defendant's home that were allegedly worn during the crime, even though the officer who seized the clothes could not testify about the handling of

the clothes in the evidence room, where the clothes were identified and there were no tests performed on the clothes "so as to make chain of custody issues important to the validity of the test results.... Any defects in the chain of custody would only go to the weight or credibility of the evidence, not to its admissibility.").

Moreover, even if a strict proof of the chain of custody were required, the State presented sufficient evidence to support the admission of the fragment. As outlined above, the State presented the testimony of Sergeant Kirkman, who collected the fragment, and of Deputy Ellison, the evidence custodian. Their testimony establishes that they were the only officers to come into contact with the porcelain fragment once it was seized by Kirkman. Thus, the evidence presented by the State adequately established the chain of custody and sufficiently foreclosed the possibility of tampering with the evidence.

The fact that the first officer on the scene of the accident did not testify is simply irrelevant to the chain of custody issue. Because the fragment was not seized at the scene, there was no need for the testimony of the investigating officer. Equally irrelevant is the fact that the police never took custody of Allen's truck. Clearly, law enforcement authorities are entitled to seize an individual piece of evidence without seizing or otherwise securing the site where the evidence was located. As noted above, Sergeant Kirkman testified that he seized the porcelain fragment from the truck. The porcelain fragment, therefore, was relevant and admissible, without regard to whether the truck itself was ever in police custody.

Finally, the fact that the fragment was not seized until the day after the incident is likewise irrelevant to the chain of custody question. As noted above, both of the law enforcement officials who processed the fragment testified at trial about their handling of the evidence and properly accounted for the time the fragment was in police custody. There is simply no requirement that, before a piece of evidence may be admitted, the police must account for time between the commission of the crime and the seizure of the evidence. While the lapse of time between a crime and the seizure of evidence

may affect the weight or credibility of the evidence, it does not affect the admissibility of the evidence. *See, e.g., Wells,* —— S.C. at ——, 426 S.E.2d at 817 ("Any defects in the chain of custody would only go to the weight or credibility of the evidence, not to its admissibility."); *accord State v. Kahan,* 268 S.C. 240, 244, 233 S.E.2d 293, 294 (1977).[2]

### III.

Glenn also contends the trial court erred in admitting the trial testimony of Larry and Samuel Duckett. As noted above, Larry Duckett testified that Glenn told him that he had been throwing items into moving vehicles and that Glenn wondered what it would be like to kill someone. Samuel Duckett, Larry's brother, also testified. In response to the solicitor's question about whether Glenn told Samuel that he had a desire to throw things into moving vehicles, Samuel responded:

> No, it ain't exactly like a craving, like he wanted to do something like this or something. He didn't really, you know, like was put like [sic] a big desire or anything to do something like this. It's just something spur of the moment.

On appeal, Glenn contends that the testimony of the Duckett brothers was not specific as to time and place, thus preventing effective cross-examination, and that the events about which they testified were too remote. Accordingly, Glenn argues the trial court erred by admitting their testimony. We disagree.

The admission of evidence is a matter within the discretion of the trial court and will not be reversed on appeal absent an abuse of that discretion. *State v. Tucker,* 319 S.C.

---

**2.** In his petition for rehearing, Glenn argues that the fingerprint taken from the porcelain fragment should be considered a fungible item subject to strict proof of the chain of custody. Assuming that there should be a separate chain of custody analysis for the fingerprint itself, we find no error. The State's evidence established precisely what was done with the porcelain fragment *and* the fingerprint from the time the fragment, and the fingerprint obtained therefrom, was seized. Whether or not the fingerprint is considered fungible evidence, the State is simply not required to account for the time before the fingerprint came into its possession.

425, 462 S.E.2d 263 (1995), *cert. denied,* 516 U.S. 1080, 116 S.Ct. 789, 133 L.Ed.2d 739 (1996). Clearly, the testimony of the Duckett brothers was relevant, given that it identified Glenn as a suspect. *See* Rule 401, SCRE (Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). Nonetheless, otherwise relevant evidence may lose its probative value when it becomes too far removed from the event in question. *State v. Bright,* 323 S.C. 221, 473 S.E.2d 851 (Ct.App.1996), *cert. denied* (February 6, 1997). However, there is no set rule as to what lapse of time will make particular evidence too remote to be probative, and the determination of remoteness is a matter within the discretion of the trial court. *Id.* at 226, 473 S.E.2d at 853. Both Duckett brothers testified that their conversations with Glenn occurred sometime during the year prior to the incident involving Allen. Accordingly, we find no abuse of discretion in the trial court's conclusion that the conversations were not too remote.

Moreover, even if there was error in admitting the testimony of the Ducketts, any such error was harmless. The State presented, without objection, the testimony of Donna Durham, a clerk at Wal–Mart. She testified that Glenn came into the store a few months after this incident and started boasting about his involvement in the incident. Glenn told her that he and John Hayes were the ones accused of throwing the commode off the bridge, but that John Hayes was the one who actually threw it off the overpass. Given this testimony placing Glenn at the scene of the crime, the testimony of the Ducketts was merely cumulative, and its admission was, therefore, harmless. *See, e.g., State v. Rochester,* 301 S.C. 196, 391 S.E.2d 244 (1990) (The admission of improper evidence is harmless where the evidence is merely cumulative.).

## IV.

Finally, Glenn argues the trial court erred in denying his motion for directed verdict. Glenn contends his motion for directed verdict should have been granted because the State failed to prove that Glenn acted with malice. Glenn also argues that the State failed to establish that Glenn acted willfully and with a specific intent to kill. Again, we disagree.

■ When ruling on a motion for a directed verdict, the trial court is concerned with the existence of evidence, not with its weight. If, when viewed in the light most favorable to the State, there is any direct or substantial circumstantial evidence which reasonably tends to prove the guilt of the accused, refusal by the trial court to direct a verdict is not error. *State v. Long*, 325 S.C. 59, 480 S.E.2d 62 (1997); *State v. Williams*, 321 S.C. 327, 468 S.E.2d 626, *cert. denied*, —— U.S. ——, 117 S.Ct. 230, 136 L.Ed.2d 161 (1996).[3]

■ Assault and battery with intent to kill (ABIK) is the unlawful act of a violent nature to the person of another with malice aforethought, either express or implied. *State v. Foust*, 325 S.C. 12, 479 S.E.2d 50 (1996). Assault and battery with intent to kill contains all the elements of murder except the actual death of the person assaulted. Before a person can be convicted of ABIK, the jury must be satisfied beyond a reasonable doubt that if the party assaulted had died from the injury, the defendant would have been guilty of murder. Accordingly, ABIK requires an intent to kill accompanied by malice. *Id.* at 14, 479 S.E.2d at 51. With respect to the intent to kill, it is sufficient for the State simply to establish a general intent as opposed to a specific intent to kill. *Foust*, 325 S.C. at 14–16, 479 S.E.2d at 51–52.[4]

---

3. Glenn also argues that the State's case was totally circumstantial and that the State failed to meet its burden to prove the case to a moral certainty. This argument, however, confuses the trial court's standard for submitting a circumstantial evidence case to the jury with the standard to be applied by the jury in evaluating the circumstantial evidence. Where the evidence is circumstantial, the trial court must submit the case to the jury if there is any substantial evidence which reasonably tends to prove the guilt of the accused or from which his guilt may be fairly and logically deduced. *State v. Horne*, 324 S.C. 372, 478 S.E.2d 289 (Ct.App.1996). The standard to be applied by the jury in its deliberations, however, is that it may not convict the defendant unless every circumstance relied upon by the State has been proven beyond a reasonable doubt, and all of the circumstances so proven are consistent with each other and, taken together, point conclusively to the guilt of the accused to the exclusion of every other reasonable hypothesis. *Id.* at 379, 478 S.E.2d at 293.

4. At oral argument, Glenn argued that *Foust* changed the law and that, at the time of trial, evidence of a specific intent to kill was required to sustain an ABIK conviction. We disagree. The Supreme Court in *Foust* did not change the law of ABIK, but instead clarified it by making

■ In this case, we conclude that the evidence as outlined above was sufficient to allow the jury to conclude that Glenn acted with malice and with an intent to kill. Clearly, the jury could have reasonably inferred that Glenn acted with malice, particularly in light of the evidence establishing that Glenn waited on the overpass for a motorist to pass by and then intentionally dropped a heavy item onto the moving vehicle. *See, e.g., State v. Bell,* 305 S.C. 11, 406 S.E.2d 165 (1991) (Malice is the doing of a wrongful act intentionally and without just cause or excuse.), *cert. denied,* 502 U.S. 1038, 112 S.Ct. 888, 116 L.Ed.2d 791 (1992); *State v. Johnson,* 291 S.C. 127, 128, 352 S.E.2d 480, 481 (1987) ("Malice has been defined as the wrongful intent to injure another and indicates a wicked or depraved spirit intent on doing wrong.").

The evidence was likewise sufficient to support a finding that Glenn acted with the requisite intent. In *State v. Hayes,* 272 S.C. 256, 250 S.E.2d 342 (1979), *overruled in part on other grounds by State v. Doctor,* 306 S.C. 527, 413 S.E.2d 36 (1992), the defendant was convicted of assault and battery with intent to kill as a result of injury to a passing motorist who was struck by a brick thrown by the defendant from an overpass onto the interstate. With respect to the element of intent to kill, the Supreme Court agreed with the trial court's conclusion that the act was of such gross recklessness as to be tantamount to intent. Thus, the Court held that the intent to kill could be inferred from the surrounding circumstances. *Id.* at 259, 250 S.E.2d at 343. The evidence presented in this case establishes a similar act of gross recklessness and, therefore, is sufficient to support a finding that Glenn intended to kill. *See also Foust,* 325 S.C. at 16, 479 S.E.2d at 52, n. 4 (Evidence of the character of the means or instrument used, the manner in which it was used, the purpose to be accomplished, and resulting wounds or injuries are admissible to show the intent with which an assault was committed.). The trial court, therefore, did not err by denying Glenn's motion for directed verdict.

---

clear that a specific intent to kill has never been an element of ABIK. *Foust,* 325 S.C. at 14, 479 S.E.2d at 51. Accordingly, at the time Glenn was tried, the State was required to prove only the Glenn acted with a general intent.

Accordingly, for the foregoing reasons, the judgment below is hereby

**AFFIRMED.**

GOOLSBY and ANDERSON, JJ., concur.