603 S.E.2d 910

**The STATE, Respondent,**

v.

**Heyward Leon ROGERS, Appellant.**

**No. 3854.**

Court of Appeals of South Carolina.

Heard June 9, 2004.

Decided Aug. 9, 2004.

180

Senior Assistant Appellate Defender Wanda P. Hagler, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Charles H. Richardson and Senior Assistant Attorney General Norman Mark Rapoport, all of Columbia; Solicitor Donald V. Myers and Assistant Solicitor C. Dayton Riddle, both of Lexington, for Respondent.

HEARN, C.J.:

Heyward Leon Rogers was convicted of two counts of first degree criminal sexual conduct, assault and battery with intent to kill, kidnapping, and strong arm robbery. On appeal, Rogers argues the court erred by (1) allowing the solicitor to ask leading questions during the deaf victim's direct examination, (2) allowing the victim's son to serve as her interpreter during cross-examination, (3) failing to grant Rogers' motion for a mistrial after learning that six jurors were exposed to a newspaper article about the trial, (4) admitting a purse into evidence before the victim identified it, (5) admitting fingerprint results into evidence, and (6) sentencing him to life without parole when his last conviction for a most serious crime was nineteen years prior to this conviction. We affirm.

## FACTS

On the evening of September 28, 2002, the victim left a fast food restaurant in West Columbia and was walking toward a video poker parlor when a man pushed her to the ground and raped her. The victim fought back and eventually caused her perpetrator to flee by throwing sand in his eyes. When the perpetrator fled, he took with him the victim's purse and her newly purchased food. A police officer on patrol found the victim shaking and crying on the side of the road, and he called an ambulance. The victim was transported to the hospital where a rape protocol kit was prepared. A week

later, the victim helped the police draw a composite sketch of her assailant, which was used to arrest Rogers.

The victim, who was fifty-seven years old at the time of the attack, has been deaf since the age of eight. As a result, her speech is difficult to understand, and she communicates through some vocalization combined with gestures. Because of this unique system of communication, both the solicitor and Rogers' counsel had problems eliciting testimony from the victim at trial. To cope with the problems, the trial court allowed the extensive use of leading questions during the victim's direct examination. During cross-examination, however, leading questions alone did not facilitate communication between the victim and defense counsel. Thus, the court found it necessary to allow the victim's son to serve as an interpreter.

Rogers was convicted on all charges and sentenced concurrently to fifteen years for robbery and four sentences of life without possibility of parole for the other charges. We affirm.

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only. We are bound by the trial court's factual findings unless they are clearly erroneous." *State v. Wilson*, 345 S.C. 1, 5–6, 545 S.E.2d 827, 829 (2001) (citation omitted).

## LAW/ANALYSIS

Rogers raises six issues on appeal: (1) the failure to appoint an interpreter during the victim's direct-examination; (2) the use of the victim's son as an interpreter during the victim's cross-examination; (3) the denial of a motion for new trial after discovering jury misconduct; (4) the admission of the victim's purse into evidence; (5) the admission of fingerprint evidence; and (6) the propriety of a life without parole sentence.

### 1. Victim's direct examination.

Rogers first argues the trial court erred in failing to supply an interpreter for the victim during direct examination. We find this issue is not preserved for our review.

Because of the victim's communication problems, the trial court allowed the solicitor to use leading questions. Defense counsel repeatedly objected to the use of leading questions; however, counsel never objected to the court's failure to appoint an interpreter, nor did counsel recommend an interpreter be appointed. Now, Rogers asks this court to find error in the trial court's failure to do what was never asked of it.

■ "It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review." *Wilder Corp. v. Wilke,* 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998). "There are four basic requirements to preserving issues at trial for appellate review. The issue must have been (1) raised to and ruled upon by the trial court, (2) raised by the appellant, (3) raised in a timely manner, and (4) raised to the trial court with sufficient specificity." Jean Hoefer Toal et al., *Appellate Practice in South Carolina* 57 (2d ed.2002).

Here, Rogers never raised the issue of using an interpreter during direct examination to the trial court. Therefore, this issue is not preserved for appellate review.

## 2. Victim's cross-examination

■ Rogers also argues the trial court erred by failing to supply the victim with a qualified interpreter during cross-examination. Rogers contends the interpreter was not qualified because he was the victim's son. We disagree.

Soon after Rogers' counsel began cross-examining the victim, it became apparent that the victim could not understand many of counsel's questions. When the victim did comprehend the questions, defense counsel could not understand her responses. Because of these problems, the solicitor offered the victim's sister and the victim's son as interpreters, as they were the only two people available who could interpret the victim's unique method of communication. Defense counsel objected to the use of the sister because she was also a witness in the case. Counsel also objected to the son because he was related to the victim. The court appointed the victim's son as interpreter, after finding that it was in the best interest

of the witness and in the best interest of justice. We find no error in this decision.

Section 15–27–15 of the South Carolina Code (Supp.2003) regulates the use of interpreters in criminal proceedings. This section requires the use of qualified interpreters, who are defined in part as not being family members of the deaf witness. S.C.Code Ann. § 15–27–15(B)(1) (Supp.2003). However, the requirement of a qualified interpreter can be waived by the deaf person or by the judge in the fulfillment of justice. S.C.Code Ann. § 15–27–15(A) (Supp.2003). Specifically, the statute states that "[i]f a person elects to use an interpreter other than a qualified interpreter provided for in this section, the court must first make a determination that this action is in the best interest of the individual and is in the best interests of justice." In this case, the trial court understood the required findings and made the determination that the use of the victim's son as interpreter was in the best interest of the victim and of justice.

The trial court was confronted with a difficult situation at trial and fashioned a solution that protected the interests of the victim and justice (as the statute governing interpreters requires) while also affording Rogers with a means to cross-examine his accuser. Thus, we find no error.

### 3. Trial Publicity

█ Rogers next argues the trial court erred when it denied his motion for new trial after jury misconduct was discovered. We disagree.

During the course of the trial, it came to the court's attention that a newspaper containing an article about the ongoing trial was in the jury room. At the beginning of proceedings on the day of the article's publication, the trial court spent considerable time questioning the jury if any members had either read, seen, or had the article mentioned to them. Six jurors answered these questions in the affirmative. These six jurors were then questioned individually by the court. Three of them had not even seen the article, but had been apprised of its existence by others. These three jurors stated that they did not read or discuss the article because it would have been inappropriate. They further

testified they had not formed any opinion in this case as a result of this limited exposure to the article's existence.

The three other jurors all stated they had looked at the article. One juror stated he saw the headline of the article, but did not read it because of the court's instructions. He further said he did not see anyone in the jury room read the paper and nothing had caused him to form an opinion in this case. Another juror admitted that she was to blame for bringing the newspaper into the jury room. She explained that when a fellow juror told her the newspaper contained an article on the trial, she found the appropriate section of the newspaper, folded it, and placed it in her purse. During this action, she said she was only exposed to the headline. This juror also testified nothing caused her to form an opinion in this case.

Finally, the sixth juror admitted she scanned the article though she did not remember any information regarding Rogers. Importantly, she remembered having read details in a paragraph following one referencing Rogers' prior record. As a result, the judge excused this juror.

█ "The granting or refusing of a motion for a mistrial lies within the sound discretion of the trial court whose ruling will not be disturbed on appeal in the absence of an abuse of discretion amounting to an error of law." *State v. Wasson*, 299 S.C. 508, 510, 386 S.E.2d 255, 256 (1989). In evaluating news articles appearing during trial, the trial court must determine if they are prejudicial and whether jurors read the articles. *Id.* at 511, 386 S.E.2d at 256. If such prejudicial exposure has occurred, the court must craft an appropriate curative measure. *Id.* In *Wasson*, our supreme court affirmed the denial of a mistrial where two jurors had read an article discussing the defendant's other pending charges because the jurors had stated the article did not affect their decision to find the defendant guilty. *Id.* at 511, 386 S.E.2d at 257.

In this case, five of the six jurors had very limited exposure to the article, and all testified it had not caused them to form any opinions. The final juror was dismissed because she had read most of the article. We find the trial court thoroughly evaluated each juror's exposure to the news article and took the appropriate measures to safeguard Rogers' right to a fair trial. Therefore, we find no error.

### 4. Admission of victim's purse

██ Rogers next argues that the admission of the victim's purse into evidence was error because it had not been identified by the victim. We disagree.

The purse was entered into evidence during the testimony of Mark Jones, the police officer who retrieved the purse after a homeowner called and reported finding it in his yard. The purse was admitted at trial after Jones testified that it was the purse he retrieved, that the purse matched a description given by the victim, and that it contained an item displaying the victim's name. The victim's description of the missing purse and the discovery of items bearing her name within it link the purse to the victim and the crime. Therefore, admission of the purse at that time was not erroneous.

Moreover, the victim eventually identified the purse as belonging to her. Thus, even if the purse had been admitted without a proper foundation, the foundation was ultimately provided, and there would be no prejudice to Rogers. *See State v. Pollard*, 261 S.C. 389, 200 S.E.2d 233 (1973) (finding no prejudice where drugs were entered into evidence prior to testimony of a complete chain of custody because the chain was eventually provided); *see also* Rule 104(b), SCRE (allowing admission of evidence subject to the introduction of other supporting evidence). Therefore, we find no error in the trial court's admission of the purse into evidence.

### 5. Admission of fingerprint evidence

██ Rogers also argues the trial court erred by allowing fingerprint results into evidence without a proper chain of custody. We disagree.

Rogers' fingerprint was found on a slip of paper in the victim's purse and these results were entered into evidence through the testimony of a fingerprint analyst. Rogers contends the evidence should be excluded because the purse's chain of custody was defective.

██ Initially, we note that because the purse is a nonfungible piece of evidence, chain of custody is not required for its admission. *State v. Glenn*, 328 S.C. 300, 305, 492 S.E.2d 393, 395 (Ct.App.1997) ("[W]here the issue is the admissibility

of non-fungible evidence—that is, evidence that is unique and identifiable—the establishment of a strict chain of custody is not required. . . ."). However, even if a chain needed to be established, it had been. At trial, every individual who had possession of the purse, which contained the slip of paper, testified to having it and denied tampering with it.

Rogers points to a period of one week when law enforcement had returned the purse to the victim before retrieving the purse again and performing fingerprint tests on its contents. Apparently, Rogers' concern is that some form of tampering might have occurred while it was in the victim's possession. However, the proof of chain of custody does not have to negate all possibility of tampering. The State only needs to establish a complete chain of evidence as far as practicable. *Id.* The period of time during which the purse was returned to the victim is accounted for by the testimony of the victim's sister, who lives with the victim. The sister testified that during the week the purse was in her home, the bag containing the purse was never opened. Additionally, the officer who returned the purse testified that when she went to retrieve it, the bag containing the purse was where she had left it.

South Carolina law does not require testimony as to the exclusion of any possibility of tampering. Rather, "where the identity of persons handling the specimen is established, . . . evidence regarding its care goes only to the weight of the specimen as credible evidence," not to the admissibility of the evidence. *State v. Carter*, 344 S.C. 419, 424, 544 S.E.2d 835, 837 (2001). Accordingly, we find no error in the admission of the fingerprint results.

### 6. Life without parole

Finally, Rogers argues a sentence of life without parole is cruel and unusual punishment under this set of facts. We disagree.

Rogers was sentenced to life without parole pursuant to section 17–25–45(A) of the South Carolina Code. Section 17–25–45(A) requires that "upon a conviction for a most serious offense . . . a person must be sentenced to a term of imprisonment for life without the possibility of parole if that person has one or more prior convictions for: (1) a most serious offense."

Nineteen years prior to the convictions addressed in this opinion, Rogers was convicted of assault and battery with intent to kill, which is a "most serious offense." S.C.Code Ann. § 17–25–45(C)(1) (Supp.2003). However, Rogers argues this prior offense was too remote in time to be used to enhance his sentence for the current crime.

In *State v. Burdette*, 335 S.C. 34, 37–38, 515 S.E.2d 525, 527 (1999), the supreme court affirmed imposing a life without parole sentence where the appellant's prior offense occurred seventeen years before the triggering offense, just two years less than the span of time in our case. Furthermore, section 17–25–45(A) has withstood repeated constitutional challenges, including assertions of cruel and unusual punishment. *See, e.g., State v. Jones*, 344 S.C. 48, 56–59, 543 S.E.2d 541, 545–47 (2001) (holding "two-strikes" law constitutional under separation of powers, cruel and unusual punishment, equal protection and ex post facto challenges). Thus, we find no error in imposing a life without parole sentence in this case.

## CONCLUSION

For the reasons stated above, Rogers' convictions and sentences are

**AFFIRMED.**

STILWELL, J. and CURETON, A.J., concur.