# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

James Richard Rosenbaum, Appellant.

Appellate Case No. 2018-002240

———————

Appeal From Horry County
Benjamin H. Culbertson, Circuit Court Judge

———————

Opinion No. 5928
Heard February 9, 2022 – Filed August 3, 2022

———————

**AFFIRMED**

———————

Appellate Defender Susan Barber Hackett, of Columbia,
for Appellant,

Attorney General Alan McCrory Wilson and Senior
Assistant Deputy Attorney General William M. Blitch,
Jr., of Columbia, and Solicitor Jimmy A. Richardson, II,
of Conway, for Respondent.

———————

**GEATHERS, J:** In his appeal from a voluntary manslaughter conviction, Appellant James R. Rosenbaum argues the circuit court erred by (1) denying Appellant immunity from prosecution pursuant to the Protection of Persons and Property Act (the Act); (2) allowing the State to introduce evidence of Appellant's prior victimhood of sexual assault as well as his jailhouse statements as probative evidence of a racial motive for the alleged crime; and (3) improperly instructing the jury regarding evidence of his codefendant's guilt. We affirm.

## FACTS/PROCEDURAL HISTORY

In 2016, Appellant was indicted in Horry County for the murder of Roy Davis (Victim), after Victim was beaten to death with a baseball bat in the home of Appellant. On July 16–17, 2018, a hearing was held to determine whether Appellant and his codefendant, Dianne Durkin, were entitled to immunity under the Act. The circuit court held a hearing and denied immunity. Then, on December 3–10, 2018, a jury trial was held. Immediately before closing arguments began, Durkin entered a guilty plea to voluntary manslaughter pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970). The jury ultimately found Appellant guilty of voluntary manslaughter, and he was sentenced to fifteen years of incarceration.

At the time of the incident, Durkin and Appellant had been romantically involved for about two years. She and Appellant moved to Horry County in 2015, and both had histories of drug abuse. Durkin testified that she met Victim in August 2015, while she and Victim were both using drugs with a mutual friend. Victim allegedly told Durkin that he could get her a job at the farm where he was employed. Durkin testified she did not see Victim again until the night of his death, July 11, 2016, when she visited the farm to ask the farm's owner for a job. Durkin stated that she had given Victim a ride on that day and, soon after, Victim came to her home seeking another ride. She then said she gave him a glass of water and returned to a backroom to fold laundry.

Durkin then alleged that when she returned to the kitchen, Victim was "completely naked," and when she asked him to leave, he refused to do so and struck her in the face before tackling her onto a mattress that was in the kitchen. Appellant testified that he went to the gym prior to the incident, but left after the parking lot was too full. Appellant alleged that upon returning home, he heard Durkin screaming from the inside. He then put on fighting gloves he had in his car, grabbed a baseball bat[1] from outside, ran inside the house, and began attacking Victim. Durkin alleged that she got ahold of the bat at one point and struck Victim in the legs and groin. At another point during the incident, Victim became "freaked out" and attempted to flee the home, but Appellant pressed him against the wall and trapped him, at which point Durkin began kicking Victim. Appellant and Durkin also shot Victim with a pellet gun and ended up beating Victim with the baseball bat until he succumbed to his wounds and died. At some point during the struggle, Durkin called 9-1-1 to report the incident.

---

[1] Durkin and Appellant alleged that the metal baseball bat was kept on the back porch to hit balls to their dog, but they did not own a dog at the time of the incident.

Audio from Durkin's rambling, bizarre, and, at times, incoherent 9-1-1 call was used as evidence at both the immunity hearing and trial. Throughout the call, Durkin and Appellant seem to be in control of the situation and are heard throughout the audio shouting at Victim. While shouting at Victim, Appellant is clearly heard on the audio calling Victim a "f***ing n***er." Victim is heard screaming in pain and begging for mercy, at one point stating, "I can't move, I can't move." Under cross-examination, Appellant testified that he was on top of Victim as Victim was heard saying "I can't move, I can't move." Victim was still being beaten when the 9-1-1 call was connected, and the sound of the metal bat striking Victim was so distinct that the 9-1-1 operator, without being informed that a bat was being used, specifically asked about the use of a bat.

Relying on the aforementioned testimony of Appellant and Durkin, as well as Durkin's 9-1-1 call audio, the circuit court ruled that Appellant and Durkin failed to prove by a preponderance of the evidence they were entitled to immunity. The circuit court explained that no evidence as to Victim's specific cause of death was entered at the hearing and it was the defendant's burden to prove his entitlement to immunity at the hearing, which included the presentation of necessary evidence.

At trial, more evidence was presented in addition to nearly identical testimony by Durkin and Appellant, as well as the 9-1-1 audio.

Corporal Mark Johnson with the Horry County Police Department testified that he arrived on the scene on the night of Victim's death in response to the 9-1-1 call. Upon arriving at the scene, Cpl. Johnson observed a "tremendous amount of blood" throughout the home and noticed Victim's head appeared mutilated, with "brains hanging out of his head." Cpl. Johnson also noted that Appellant and Durkin appeared unharmed. Later that evening, at the detention center, Appellant discovered a small laceration on his leg that was determined by the attending physician to be minor and treated by placing a "Band-Aid" on it.

After analyzing the blood from the incident, Paulette Sutton, an expert in bloodstain pattern analysis, testified at trial that several stains along the walls of Appellant's home showed evidence of blood clotting, which indicated that Victim was injured in such a way to cause bleeding, and those wounds were clotting between ten and fifteen minutes of the wounds being inflicted. Those clots were then transferred to the walls around Victim after he was struck with enough force to detach the clots from his wounds and send them flying towards nearby surfaces, indicating very heavy blows. Sutton also concluded that nearly all of the blood at the scene was from Victim.

The State also presented evidence that Durkin and Victim had a previous relationship based on sex and drugs. Randy Hucks, the owner of the farm where Victim was employed, testified that he was aware that Victim and Durkin had a sexual relationship. Additionally, the State called Bridget Briles and Lynndale Lewis who were incarcerated with Durkin and Appellant, respectively, while awaiting trial and heard each of them make incriminating statements concerning the relationship between Durkin and Victim and their involvement in Victim's death.

Briles testified that she was incarcerated with Durkin for several days. During that time, Durkin told Briles that she had known Victim for approximately two years, during which time they often used drugs together and had sexual intercourse. Durkin also told Briles that she wished she had bleached the house and just thrown "his body into a river," and if she had done so, she "would have never been caught for it."

Lewis testified that during his time incarcerated alongside Appellant, Appellant stated that he had stayed at the VA hospital for some period of time and, upon release, was jealous and angry after hearing information[2] regarding Victim. Lewis also testified that Appellant told him that on the night of the incident, Appellant was waiting for Victim to come to his house and planned to "roll up on him." Appellant detailed that he had fighting gloves he used on Victim and beat Victim with a baseball bat. This information conflicted with Appellant's testimony that he had gone to the gym and just happened to return home in time to rescue Durkin from the alleged sexual assault. Appellant's story was further contradicted by the introduction of cell phone location evidence by the State's witness, Aaron Edens, a former FBI agent and expert witness in forensic cell phone examinations. After reviewing Google data, Edens testified that Appellant's cell phone indicated that he was approximately 250 feet from his home at four specific times during the evening of the incident: 8:45 p.m., 8:48 p.m., 8:50 p.m., and 8:52 p.m. These times correspond to when Appellant alleged he was at the gym.

The State also presented evidence indicating that the killing may have been racially motivated. First, Appellant can be heard referring to Victim as a "f***ing n***er" during the 9-1-1 call audio. Second, Appellant admitted under cross-examination that while serving in the military, he was raped by two African-American men. Finally, at the detention center, Appellant informed the guards that he did not want to share a cell with any African-American inmates. When

---

[2] The specific "information" referenced is not revealed in the testimony. Lewis stated that "[Appellant had] heard some news and all that had angered him and made him very jealous" of Victim.

confronted with this statement at trial, Appellant testified that he requested not to be housed with any African-Americans because he feared being put into a cell with a member of Victim's family. No evidence was presented that Victim had any incarcerated family members at the time of Appellant's housing request.

After the defense rested, the parties presented motions to the court. Appellant's counsel asked whether the circuit court judge would charge the jury that testimony used against one defendant cannot be used against the other defendant. The circuit court judge noted that the witnesses who testified about Durkin's statements, such as Briles, had already removed any mention of Appellant from their testimony, so no confrontation clause issue occurred and no instruction was necessary. Before the jury was charged, Durkin pleaded guilty to voluntary manslaughter. In response to this change in circumstances, the circuit court judge amended his proposed jury charges by removing any reference to "the hand of one is the hand of all," and any language relating to "aiding and abetting." The judge also added the following language:

> [T]he case against the Defendant, Diane Marie Durkin, has been resolved. The case against the Defendant, [Appellant], and the evidence of and the law concerning him should be considered separately and individually from the evidence and law concerning the Defendant, Diane Marie Durkin. Any thoughts you may have concerning the case against the Defendant, Diane Marie Durkin, should not control your verdict as to the Defendant, [Appellant].

Neither the State nor Appellant objected to this remedial instruction, and the charge was given as proposed to the jury without objection.

## ISSUES ON APPEAL

I. Did the circuit court err in denying Appellant immunity from prosecution pursuant to the Protection of Persons and Property Act?

II. Did the circuit court err in allowing the State to introduce evidence of Appellant's prior victimhood of sexual assault as well as his jailhouse statements as probative evidence of a racial motive for the alleged crime?

III. Did the circuit court err in instructing the jury regarding evidence of Appellant's codefendant's guilt?

## STANDARD OF REVIEW

In criminal matters, this court reviews errors of law only. *State v. Wilson*, 345 S.C. 1, 5–6, 545 S.E.2d 827, 829 (2001) (citing *State v. Cutter*, 261 S.C. 140, 199 S.E.2d 61, 65 (1973)). Indeed, this court is bound by the lower court's findings of fact, unless such findings are clearly erroneous. *Id.*

"This court reviews the trial court's pretrial determination of immunity for an abuse of discretion." *State v. Douglas*, 411 S.C. 307, 316, 768 S.E.2d 232, 237 (Ct. App. 2014) (citing *State v. Curry*, 406 S.C. 364, 370, 752 S.E.2d 263, 266 (2013)). The admission or exclusion of evidence is also subject to an abuse of discretion standard of review. *See State v. Adams*, 354 S.C. 361, 377, 580 S.E.2d 785, 793 (Ct. App. 2003) ("A court's ruling on the admissibility of evidence will not be reversed on appeal absent an abuse of discretion . . . ."). "An abuse of discretion occurs when the trial court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." *State v. Pittman,* 373 S.C. 527, 570, 647 S.E.2d 144, 166–67 (2007). "In other words, the abuse of discretion standard of review does not allow this court to reweigh the evidence or second-guess the trial court's assessment of witness credibility." *Douglas*, 411 S.C. at 316, 768 S.E.2d at 237–38.

## LAW/ANALYSIS

### I. Immunity from Prosecution

Appellant argues that the circuit court erred in failing to grant him immunity from prosecution pursuant to the Act. We disagree and hold that immunity was properly denied. Therefore, we affirm the circuit court's ruling on this issue.

"[W]hen a party raises the question of statutory immunity prior to trial, the proper standard for the circuit court to use in determining immunity under the Act is a preponderance of the evidence." *State v. Duncan*, 392 S.C. 404, 411, 709 S.E.2d 662, 665 (2011). This court reviews pretrial determinations of immunity under an abuse of discretion standard of review.[3] *State v. Curry*, 406 S.C. 364, 370, 752 S.E.2d 263, 266 (2013). In determining the validity of an immunity hearing's outcome, "this court cannot 'reweigh the evidence or second-guess the [circuit] court's assessment of witness credibility.'" *State v. Oates*, 421 S.C. 1, 17, 803 S.E.2d

---

[3] During an immunity hearing, it is the defendant's burden to prove his entitlement to immunity under the Act by a preponderance of the evidence. *See Duncan*, 392 S.C. at 411, 709 S.E.2d at 665.

911, 920 (Ct. App. 2017) (alteration in original) (quoting *Douglas*, 411 S.C. at 316, 768 S.E.2d at 238).  The Act states, in pertinent part,

> (A) A person is presumed to have a reasonable fear of imminent peril of death or great bodily injury to himself or another person when using deadly force that is intended or likely to cause death or great bodily injury to another person if the person:
>
>> (1) against whom the deadly force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcibly entered a dwelling, residence, or occupied vehicle, or if he removes or is attempting to remove another person against his will from the dwelling, residence, or occupied vehicle; and
>>
>> (2) who uses deadly force knows or has reason to believe that an unlawful and forcible entry or unlawful and forcible act is occurring or has occurred
>
> . . . .
>
> (C) A person who is not engaged in an unlawful activity and who is attacked in another place where he has a right to be, including, but not limited to, his place of business, has no duty to retreat and has the right to stand his ground and meet force with force, including deadly force, if he reasonably believes it is necessary to prevent death or great bodily injury to himself or another person or to prevent the commission of a violent crime as defined in Section 16-1-60.

S.C. Code Ann. § 16-11-440 (A), (C) (2015).  The immunity provided for in the Act is "predicated on an accused demonstrating the elements of self-defense to the satisfaction of the trial court."  *Curry*, 406 S.C. at 372, 752 S.E.2d at 267.  If a defendant does not demonstrate these elements by a preponderance of the evidence,

then the claim of self-defense "presents a quintessential jury question, which, most assuredly, is not a situation warranting immunity from prosecution." *Id.* Under our jurisprudence, a defendant seeking immunity under the Act must prove he was acting in self-defense by showing: (1) he was without fault in bringing on the difficulty; (2) he was in imminent danger of death or serious bodily injury or believed he was in such danger; and (3) if the defense is based on an actual belief of imminent danger, a reasonably prudent person of ordinary firmness and courage would have held the same belief.[4] *Id.* at 371 n.4, 752 S.E.2d at 266 n.4. When acting in self-defense, a person's right to use deadly force under the Act is not unlimited—a person may not use deadly force against another if there is no longer an imminent threat of serious harm. *See Oates*, 421 S.C. at 16–17, 803 S.E.2d at 919–20.

In the present case, the evidence presented during the immunity hearing was at times contradictory. Durkin testified that she knew Victim prior to the date of the incident, lent him money, and drove him to pick up drugs, yet she later admitted to telling officers she never met Victim prior to the night of his death. Evidence was presented at the hearing indicating Victim was incapacitated during the attack and not a threat to Appellant and Durkin. Indeed, Durkin admitted that during the melee, Victim no longer posed a threat and attempted to flee but was detained by Appellant and Durkin.

In *State v. Douglas*, this court upheld a finding of immunity after the respondent (Douglas) used deadly force during a physical altercation. *See generally Douglas*, 411 S.C. at 312, 768 S.E.2d at 235–36 (Ct. App. 2014). In *Douglas*, the circuit court relied on evidence proffered by the defense showing that Douglas had been assaulted and sustained serious bodily injury prior to shooting the victim, noting that

> [Douglas] fared much worse in the altercation prior to the fatal shot, and because [Victim] had no incapacitating wounds prior to that shot, [Douglas's] claimed belief that serious additional injury was about to be inflicted upon him if he did not act to protect himself was reasonable, and is supported by the evidence in this case.

*Id.* at 320, 768 S.E.2d at 240. During the incident in the present case, Victim was beaten to death to the point that Appellant's mobile home was covered in blood; meanwhile, Appellant merely sustained a small cut on his leg (requiring a "Band-

---

[4] The fourth element of self-defense at common law, the duty to retreat, is excused under the Act. *Curry* at 373–74, 752 S.E.2d at 267–68.

Aid" for treatment), and Durkin sustained a black eye and a small rip on her shirt. The facts presented in the case at bar are the inverse of those presented in *Douglas*. In *Douglas*, the person seeking immunity under the Act had sustained injuries, while his Victim did not (prior to the fatal shot). Conversely, in the present case, Appellant sustained a superficial injury, while Victim was beaten to death after he tried to flee and was admittedly no longer a threat to Appellant.

Based on the foregoing, the circuit court did not abuse its discretion in denying immunity to Appellant under the Act.

## II. The State's Evidence

Appellant contends the circuit court erred by admitting evidence of his sexual assault as well as his jailhouse statements in which he stated he did not want to be housed with African-Americans. Both statements were admitted as probative evidence of his motive to kill Victim. We disagree with Appellant's contention and hold that the admission of such evidence was not erroneous; therefore, we affirm the circuit court's ruling on this issue.

"The admission or exclusion of evidence is left to the sound discretion of the trial judge, whose decision will not be reversed on appeal absent an abuse of discretion." *State v. Black*, 400 S.C. 10, 16, 732 S.E.2d 880, 884 (2012) (quoting *State v. Saltz*, 346 S.C. 114, 121, 551 S.E.2d 240, 244 (2001)). This court should find an abuse of discretion occurred in instances ". . . when the trial court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." *State v. Jennings*, 394 S.C. 473, 477–78, 716 S.E.2d 91, 93 (2011) (quoting *Clark v. Cantrell*, 339 S.C. 369, 389, 529 S.E.2d 528, 539 (2000)). If evidence is not relevant, it is not admissible; however, even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Rule 403, SCRE. If a piece of evidence could assist the jury in arriving at the truth of an issue, such evidence is relevant and should be admitted during trial "unless otherwise incompetent." *State v. Schmidt*, 288 S.C. 301, 303, 342 S.E.2d 401, 403 (1986). Particularly, "[a]dmissibility of evidence regarding racial bias generally is within the trial judge's discretion, and the decision necessarily must be done on a case-by-case basis[,] balancing probity with the potential for unfair prejudice." Warren Moïse, *Race in the Courtroom*, 29 S.C. LAW., at 15, 16 (May 2018) (citing Rule 403, SCRE).

"When juxtaposing the prejudicial effect against the probative value, the determination must be based on the entire record and will *turn on the facts of each case*." *State v. Lyles*, 379 S.C. 328, 338, 665 S.E.2d 201, 206 (Ct. App. 2008)

(emphasis added). "The evaluation of probative value cannot be made in the abstract, but should be made in the *practical context of the issues at stake in the trial of each case*." *State v. Gray*, 408 S.C. 601, 610, 759 S.E.2d 160, 165 (Ct. App. 2014) (emphasis added). "Rule 403 only requires suppression of evidence that results in unfair prejudice—prejudice that damages an opponent for reasons other than its probative value, for instance, an appeal to emotion . . . ." *Gray*, 408 S.C. at 616, 759 S.E.2d at 168 (quoting *United States v. Mohr*, 318 F.3d 613, 619–20 (4th Cir. 2003)). Thus, only after balancing the probative value and the danger of unfair prejudice may the court determine if the danger of unfair prejudice substantially outweighs the probative value of the proffered evidence as required by Rule 403, SCRE.

Appellant argues that admission of evidence of his sexual assault while in the military and his request to not be placed in a cell with African-Americans was irrelevant to his involvement in the alleged killing; thus, the danger of unfair prejudice from such admission substantially outweighed any probative value. We disagree, as Appellant's potential racial animus was a critical consideration in establishing Appellant's motive to kill Victim.

The State did not proffer the evidence of the sexual assault and/or housing request without first establishing Appellant's potential racial bias. Indeed, Appellant's potential racial bias first surfaced during the 9-1-1 recording when, during the melee, he repeatedly referred to Victim as a "f***ing n***er." The use of racial slurs and epithets are typically strong indicators of racial animus. *See Mohr*, 318 F.3d at 620–21 (4th Cir. 2003) (comment about releasing dog on woman's "black ass" admissible under Rule 404(b) as to intent when it could not be redacted without changing the meaning of the statement); *see also* T.N. Brown et al., *Differentiating Contemporary Racial Prejudice from Old-Fashioned Racial Prejudice*, 1 RACE & SOCIAL PROBLEMS 97–110 (2009). Indeed, "racial insult[s] remain[] one of the most pervasive channels through which discriminatory attitudes are imparted." Richard Delgado, *Words That Wound: A Tort Action for Racial Insults, Epithets, and Name-Calling*, 17 HARV. C. R.-C. L. L. REV. 133, 135 (1982). In *Alcorn v. Anbro Engineering, Inc.*, the Supreme Court of California noted that the racial slur "n***er" is particularly abusive and insulting. 468 P.2d 216, 219 n. 4 (Cal. 1970); *see* Delgado*, supra* at 153.

Appellant's use of an offensive racial slur towards Victim laid the foundation for the State's introduction of evidence of Appellant's sexual assault and housing request. Considered together, it is reasonable that a jury could conclude that Appellant's actions were racially motivated. Appellant testified that his sexual assault in 1980 was still impacting him at the time of trial, as he suffered from post-traumatic stress disorder from the incident. Further, Appellant's statement at the

detention center was made merely hours after the killing and indicated that a primary concern of his was not to share a cell with any African-Americans. Appellant justified this request by stating that he feared being incarcerated with family members of Victim. Yet, there is no evidence showing that Appellant knew or had reason to know of any family members of Victim who were in jail. *See* Kelly Welch, *Black Criminal Stereotypes and Racial Profiling*, 23 J. CONTEMP. CRIM. JUST. 276, 276–77 (Aug. 2007) (arguing that due to harmful racial stereotypes, Blacks are consistently and inaccurately stereotyped as criminals).

The State had the burden to prove Appellant's actions were not in self-defense, but rather constituted an unjustified effort to harm Victim (or that Appellant's actions involved a degree of force exceeding that necessitated by the situation). Thus, the State presented the aforementioned evidence of potential racial animus held by Appellant, which made it more probable that Appellant's actions were not self-defense. The evidence presented was important for evaluating the appropriateness of Appellant's actions by establishing a potential motive; thus, its probative value was not substantially outweighed by the potential of unfair prejudice. Indeed, after weighing this probity with the risk of unfair prejudice, the circuit court properly admitted testimony regarding Appellant's sexual assault and detention center housing request.

In this case, the question of identity is not at issue: all parties agreed that Appellant and Durkin were the actors involved in Victim's death. Therefore, the establishment of guilt hinged upon the *motive* of Appellant's actions—self-defense or unjustified actions to cause the death of Victim. Establishing a racial motive in this case was significant for the State because the State had the burden to prove Appellant's actions were not in self-defense, but rather constituted an unjustified effort to harm Victim. *State v. Sweat*, 362 S.C. 117, 124, 606 S.E.2d 508, 512 (2004) ("Generally, motive is not an element of a crime that the prosecution must prove to establish the crime charged, but frequently motive is circumstantial evidence . . . of the intent to commit the crime when intent or state of mind is in issue." (quoting Danny R. Collins, *South Carolina Evidence* 319 (2d ed. 2000)); *State v. Cheeseboro*, 346 S.C. 526, 547, 552 S.E.2d 300, 311 (2001) ("evidence of motive is admissible as relevant and need not be necessary to the State's case" (citing *State v. Bell*, 302 S.C. 18, 29, 393 S.E.2d 364, 370 (1990))). Therefore, the probative value was not substantially outweighed by the danger of unfair prejudice.

For the foregoing reasons, the circuit court did not abuse its discretion in admitting the evidence of Appellant's sexual assault or detention center housing request.

### III. Jury Instruction

Appellant argues that the circuit court failed to give the instruction he requested and instead gave an instruction that highlighted his guilt and confused the jury. The record indicates the circuit court issued a proper jury charge as to the evidence concerning Durkin. This issue was not properly preserved for appellate review as the Appellant failed to object to the jury charge provided by the judge. Thus, we affirm the circuit court's ruling on this issue.

In order for an issue to be preserved for appellate review, "[t]he issue must have been (1) raised to and ruled upon by the [circuit] court, (2) raised by the appellant, (3) raised in a timely manner, and (4) raised to the [circuit] court with sufficient specificity." *State v. Rogers*, 361 S.C. 178, 183, 603 S.E.2d 910, 912–13 (Ct. App. 2004) (quoting Jean Hoefer Toal et al., *Appellate Practice in South Carolina* 57 (2d ed. 2002)). Indeed, should a party fail to properly object, the party is procedurally barred from raising the issue on appeal. *State v. Johnson*, 363 S.C. 53, 58–59, 609 S.E.2d 520, 523 (2005).

In this matter, Appellant's challenge to the circuit court's jury charge is not preserved for appellate review. No objection was made to the charge proposed by the circuit court in response to Durkin's plea, nor was any objection made after the charge was presented to the jury. As a result, Appellant's argument regarding the adequacy of the charge is not preserved for appellate review.

Even assuming that the issue was preserved for this court's review, we would still affirm, as the circuit court properly charged the jury. In *Bruton v. United States*, the Supreme Court held that during a joint trial, admission of a non-testifying codefendant's statement expressly inculpating the defendant violates the inculpated defendant's rights under the Confrontation Clause. 391 U.S. 123, 135–37 (1968). The Court's reasoning was that even if a limiting instruction were to be used, it would still be insufficient to remove any prejudice to the defendant in such a situation. *Id.* Notably, in *Richardson v. Marsh*, the Supreme Court narrowed the rule it previously set forth in *Bruton*. 481 U.S. 200, 207–08 (1987). In that case, the Court held the rule outlined in *Bruton* is not applicable in instances where a codefendant's statement is "not incriminating on its face," and becomes so "only when linked with evidence introduced later at trial." *Richardson*, 481 U.S. at 206. The *Richardson* court also indicated *Bruton* may be complied with by redaction when the statement is incriminating on its face. *Id.* at 208–09.

The statements made by Appellant's codefendant (Durkin) were properly admitted at trial, as Durkin's statements did not implicate Appellant on their face.

Pursuant to *Richardson*, the circuit court allowed Durkin's self-incriminating statements into evidence only after any reference to Appellant was removed. Appellant's only contention is that the circuit court should have given a curative instruction in its jury charge providing that the statements of one defendant cannot be used against the other. At trial, the circuit court instructed any witnesses testifying to statements from a defendant to omit any reference to his or her codefendant; thus, no statements were admitted that required curative instructions.

Due to the circuit court's strict adherence to *Bruton* and *Richardson*, no Confrontation Clause violation occurred in the present matter.

## CONCLUSION

The circuit court did not abuse its discretion by denying Appellant immunity from prosecution pursuant to the Protection of Persons and Property Act or by allowing the State to introduce evidence of Appellant's prior victimhood of sexual assault as well as his jailhouse statements. Further, the circuit court properly charged the jury as to the evidence regarding Durkin. Therefore, Appellant's conviction is

**AFFIRMED.**

**HILL, J. and LOCKEMY, A.J., concur.**